**Dale JONES, et al., Plaintiffs,**

v.

**The AMERICAN TOBACCO COMPANY, et al., Defendants.**

**Judith WILLIAMS, et al., Plaintiffs,**

v.

**R.J. REYNOLDS TOBACCO COMPANY, et al., Defendants.**

Nos. 5:97CV0593, 5:97CV0594.

United States District Court,
N.D. Ohio,
Eastern Division.

April 23, 1998.

A. Russell Smith, R. Bryan Nace, Laybourne, Smith, Gore & Goldsmith, Akron, OH, for Dale Jones and Dorothy Jones.

David S. Cupps, J. Scott Jamieson, Vorys, Sater, Seymour & Pease, Columbus, OH, Thomas E. Riley, Chadbourne & Parke, New York City, for Brown & Williamson Tobacco Corp.

Diane P. Chapman, Thomas H. Shunk, Baker & Hostetler, Cleveland, OH, Thomas J. Frederick, Dan K. Webb, Thomas R. Bearrows, Joseph J. Zaknonen, Winston & Strawn, Chicago, IL, for Philip Morris Inc.

Robert C. Weber, Kim F. Bixenstine, Dennis L. Murphy, Roger Allen Hipp, Jones, Day, Reavis & Pogue, Cleveland, OH, R.J. Reynolds Tobacco.

David J. Hooker, Thomas J. Collin, Robert Francis Ware, Jr., Thompson, Hine & Flory, Cleveland, OH, Steven Klugman, Harry Zirlin, Debevoise & Plimpton, New York City, for Council for Tobacco Research—U.S.A., Inc.

*MEMORANDUM OPINION
AND ORDER*

(Resolving Docket Nos. 38, 41–1, 41–2, 43 and 71).

(Resolving Docket Nos. 48, 51–1, 51–2, 55 and 78).

DOWD, District Judge.

## I. INTRODUCTION

Before the Court are several motions that apply with equal force to both of the above cited cases.[1] Defendants R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation (as successor by merger to The American Tobacco Company), and Phillip Morris Incorporated filed a joint motion to dismiss Plaintiffs' third amended complaints pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. (Docket No. 38). Defendant Council for Tobacco Research—U.S.A., Inc. joined in this motion to dismiss pursuant to this Court's Order of September 23, 1997. (Docket No. 61). For the reasons set forth below, this motion is GRANTED in part, and DENIED in part.

The second motion before the Court is Plaintiffs' motion for relief from judgment (Docket No. 41–1), or in the event that relief is not granted a motion for a rule 54(b) judgment (Docket No. 41–2). This motion requests relief from the Court's dismissal (Docket No. 33) of Defendant Tobacco Institute for lack of personal jurisdiction. In the event that the Court denies relief from the judgment, Plaintiffs' motion requests that the Court issue a final appealable order pursuant to Federal Civil Rule 54(b). For the reasons set forth below, these motions are DENIED.

Plaintiffs have also filed a motion (Docket No. 43) to certify two questions to the Ohio Supreme Court. For the reasons set forth below, this motion is DENIED.

The final motion that is before the Court is Plaintiffs' motion (Docket No. 71) for leave to present additional information in support of

---

1. As listed above, the motions have been separately docketed in both cases. However, because the motions and responses are practically identical, and in order to avoid undue confusion, the Court will refer to the motions according to the docket numbers used in ·5:97CV0593, and if appropriate, will differentiate between the two Plaintiffs' claims.

Plaintiffs' motion for relief from judgment. For the reasons expressed below, this motion is GRANTED.

## II. BACKGROUND FACTS

Plaintiff Judith Mae Williams ("Ms. Williams") is an Ohio resident who has lived and worked in Ohio for most of her adult life. (Williams Third Amended Complaint ¶ 1). Plaintiff Ronny Williams ("Mr. Williams") was the spouse of Ms. Williams at all times relevant to this action. (*Id.* at ¶ 112). Ms. Williams began smoking in 1954 at age 11. (*Id.*, ¶ at 11). She asserts that she started smoking a full pack of cigarettes a day at age 16. (*Id.*) Ms. Williams smoked several brands of cigarettes, including Pall Mall, Benson & Hedges, Viceroy, Cambridge, and Winston brands. (*Id.* at ¶ 10). She smoked various other brands whenever **her** regular cigarettes were not available. (*Id.*). Although she attempted to quit smoking on several occasions, Ms. Williams was not successful, and continued smoking until 1990, when she was able to quit. (*Id.* at ¶ 11). Today, Ms. Williams suffers from chronic obstructive pulmonary disease, chronic bronchitis, asthma and other personal injuries. (*Id.* at ¶ 108). Mr. Williams claims that he has been deprived of his wife's services and consortium, and states that as a further result he has had to expend large amounts of money for Ms. Williams' medical care and treatment. (*Id.* at ¶ 113).

Plaintiff Dale Jones ("Mr. Jones") is an Ohio resident who has lived and worked in Ohio for most of his life. (Jones Third Amended Complaint ¶ 1). Plaintiff Dorothy Jones ("Ms. Jones") was the wife of Mr. Jones at all times relevant to this action. (*Id.* at ¶ 112). Mr. Jones began smoking during his teenage years, in approximately 1968. (*Id.* at ¶ 11). Mr. Jones smoked several brands of cigarettes, including Pall Mall, Marlboro, and Doral. (*Id.* at ¶ 10). He smoked various other brands whenever his regular cigarettes were not available. (*Id.*). Although Mr. Jones asserts that he has tried to quit smoking through various methods, he has been unable to do so. (*Id.* at ¶ 11). Today, Mr. Jones suffers from bronchogenic carcinoma. (*Id.* at ¶ 109). Ms. Jones claims that she has been deprived of her husband's services and consortium, and states that as a further result of her condition, she has had to expend large amounts of money on Mr. Jones' medical care and treatment. (*Id.* at ¶ 113).

Plaintiffs assert liability on several theories: (1) strict liability (Third Amended Compl. ¶¶ 26–31); (2) negligent, wilful and wanton misconduct (*Id.* at ¶¶ 32–34); (3) fraud and misrepresentation based on both the Ohio Product Liability Act and common law fraud (*Id.* at ¶¶ 35–85); (4) strict liability for misrepresentation (*Id.* at ¶¶ 86–87); (5) express warranty (*Id.* at ¶¶ 88–89); (6) implied warranty (*Id.* at ¶¶ 90–92); and (7) conspiracy and concerted action (*Id.* at ¶¶ 93–107). For damages, Plaintiffs each seek $5,000,000.00 in compensatory damages, $5,000,000.00 in punitive damages, plus court costs and attorneys' fees. The spouses of Plaintiffs each seek $1,000,000.00 in compensatory damages, $1,000,000.00 in punitive damages, plus court costs and attorneys' fees.

In both of these cases, the original complaints were filed in the Summit County Court of Common Pleas. They were then removed to this Court on March 7, 1997. (Docket No. 3). On June 23, 1997, amended complaints were filed in both cases, adding Mr. Williams as an additional plaintiff in the *Williams* case, and Bat Industries P.L.C. (as successor in trust to The American Tobacco Company) as a defendant in both cases. (Docket No. 26).

On July 3, 1997, this Court dismissed the Tobacco Institute ("TI"), as a defendant in both cases, for lack of personal jurisdiction. (Docket No. 29). The Court later withdrew that opinion because of a typographical error, and replaced it with a corrected memorandum opinion and order. (Docket No. 33).

Second Amended Complaints were filed in both cases on September 23, 1997. (Docket No. 63). The Second Amended Complaints deleted Bat Industries P.L.C. as a defendant in both cases. Furthermore, the Second Amended Complaints named the identical five parties as defendants in both cases: R.J. Reynolds Tobacco Company, Council for Tobacco Research—U.S.A., Inc., The Tobacco

Institute (which was dismissed by the Court, but retained by Plaintiffs presumably for purposes of moving for relief from that dismissal), Brown & Williamson Tobacco Corporation (as successor by merger to The American Tobacco Company), and Philip Morris, Inc.

Upon review of the Second Amended Complaints, the Court issued an order (Docket No. 64), in which it asked Plaintiffs to indicate whether the claim of "fraud and misrepresentation" was based in common law fraud or the Ohio Products Liability Act. Further, the Court stated that to the extent that Plaintiffs' claim was in fact based in common law fraud, the Court found that it failed to meet the specificity requirements of Fed. R.Civ.P. 9(b), and thus granted Plaintiffs leave to file a third amended complaint to attempt to meet those requirements.

In response, Plaintiffs filed a memorandum (Docket No. 66), in which they asserted that they intended to set forth both a claim of common law fraud and a claim under the Ohio Product Liability Act § 2307.76. Additionally, Plaintiffs filed Third Amended Complaints (Docket No. 65) in both cases, adding approximately fifty new paragraphs to the "Fraud and Misrepresentation" sections of their complaints. (Third Amended Compl. ¶¶ 39–85).

With these new paragraphs, Plaintiffs attempt to meet the particularity requirements of Rule 9(b). Plaintiffs cite to specific advertisements, by date and location, which they claim support their assertions of fraud and misrepresentation by Defendants. Plaintiffs begin by citing to a July 19, 1995 issue of the Journal of the American Medical Association, which concluded that:

> Research conducted by tobacco companies into the deleterious health effects of tobacco was often more advanced and sophisticated than studies by the medical community.
> The industry decided to conceal the truth from the public.
> The industry hid their research from the courts by sending the data through their legal departments, their lawyers asserting that the results were immune to disclosure in litigation because they were the privi-

leged product of the lawyer-client relationship.

> Despite their knowledge to the contrary, the industry's public position was and continues to be that the link between smoking and ill health was not proven, that they were dedicated to determining whether there was such a link and revealing this to the public, and that nicotine was not addictive.

(Third Amended Compl. ¶ 36, quoting Journal of American Medical Association (Vol. 274, No. 3)). Plaintiffs then proceed to cite to specific instances which they assert exemplify the tobacco companies' denial that there was a link between smoking and cancer, and the tobacco companies' attempt to discredit the independent studies demonstrating this link. For example, Plaintiffs assert that in the 1930s and 1940s, the tobacco companies made the following statements about tobacco products:

> Old Gold—"not a cough in a Carload"
>
> Camel—"Not a single case of throat irritation due to smoking Camels"
>
> Philip Morris—"The Throat-tested cigarette"

(Third Amended Compl. ¶ 43). Plaintiffs also claim that Philip Morris ran an ad in the 1943 issue of the National Medical Journal which read:

> "Don't smoke!" is advice hard for patients to swallow. May we suggest instead "Smoke Philip Morris!" Tests showed three out of every four cases of smokers' cough cleared on changing to Philip Morris. Why not observe the results for yourself?

(*Id.* at ¶ 44).

Plaintiffs then list the following additional examples from the 1960s, 70s and 80s:

> a. June–July 1960 Tobacco and Health, Vol. III, No. 1, published by TI (includes statements advocating doing more research before any conclusions are drawn regarding smoking causing chronic lung diseases; air pollution is suggested as major cause of lung cancer increase);

b. December 16, 1995 press release from Hill & Knowlton, Inc. for TI (includes statement that study suggests "tobacco smoke did not act as a carcinogen");

c. August 13, 1963 press release for TI (includes statement "Science does not know what causes [lung cancer]");

d. 1971 article by TI called "Smoking/Health: An Age–Old Controversy" ("The tobacco industry believes the American public ... have a right to hear all the facts involved in the *controversy*, not just those advanced by the anti-smoking groups. The Tobacco Institute has prepared several television and radio public service messages now available for use by the broadcast media ... Rather than letting debate be shut off on this *controversy*, as some advocate, the tobacco industry calls for two major actions. First, intensified and cooperative research to get the scientific facts on the health questions, rather than relying on 'guesses', assumptions and suspicions; Second, more attention to not just sensational charges and jazzy anti-smoking slogans but also the doubts and uncertainties that are accumulating about the extremist anti-smoking charges");

e. August 5, 1971 United States Tobacco Journal advertisement by TI ("If you're worried about cigarettes ... may we confuse you with some facts? Send for 'The Cigarette Controversy'. It tells the truth.");

f. November 23, 1981 Omaha World Herald article written by TI (Headline: More Research Needed on Tobacco Use);

g. February 17, 1984 memorandum regarding TI advertisement to be published in Phoenix and Tucson papers (indicates that tobacco industry stands "squarely behind its research commitment, and firmly behind its own responsibility to help find definitive answers to the questions about smoking and health").

(*Id.* at ¶ 47).

The Third Amended Complaint then cites to a January 15, 1968 issue of True Magazine containing an article written by Stanley Frank called "To Smoke or Not to Smoke—That is Still the Question." Plaintiffs assert that this article dismissed the evidence against smoking as "inconclusive and inaccurate" and claimed that "[s]tatistics alone link cigarettes with lung cancer—it is not accepted as scientific proof of the cause and effect." (*Id.* at ¶ 48). Plaintiffs further assert that a few months later, a similar but shorter article was run in the National Enquirer entitled "Cigarette Cancer Link is Bunk," and written by a fictitious name often used by the Enquirer. (*Id.*) Plaintiffs assert that the author of this article was also Frank, and that certain tobacco companies paid him to write the article. (*Id.*)

As another example, Plaintiffs point to an advertisement run by the Tobacco Institute in 1970, captioned "A Statement About Tobacco and Health," which stated:

We recognize that we have a special responsibility to the public—to help scientists determine the facts about tobacco and health, and about certain diseases that have been associated with tobacco use.

We accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee which provides research grants to independent scientists. We pledge continued support of this program of research until all the facts are known.

Scientific advisors inform us that until much more is known about such diseases as lung cancer, medical science probably will not be able to determine whether tobacco or any other single factor plays a causative role—or whether such a role might be direct or indirect, incidental or important.

We shall continue all possible efforts to bring the facts to light.

(*Id.* at ¶ 49).

In contrast, however, Plaintiffs then cite to private memoranda from the cigarette industry which Plaintiffs assert showed knowledge about the health hazards of cigarettes. (*Id.* at ¶¶ 54, 57–61). As additional internal infor-

mation know by the defendants, Plaintiffs cite to the following:

a) In 1962, Sir Charles Ellis, scientific advisor to the board of directors of British American Tobacco Company ("BATCO"), Brown & Williamson's parent company, stated at a meeting of BATCO's worldwide subsidiaries, that "smoking is a habit of addiction" and that "[n]icotine is not only a very fine drug, but the technique of administration by smoking has considerable psychological advantages...." He subsequently described Brown & Williamson as being "in the nicotine rather that the tobacco industry."

b) A research report from 1963 commissioned by Brown & Williamson states that when a chronic smoker is denied nicotine: "A body left in this unbalanced state craves for renewed drug intake in order to restore the physiological equilibrium. This unconscious desire explains the addiction of the individual to nicotine." No information from that research has ever been voluntarily disclosed to the public; in particular, it was not shared with the Committee that was preparing the first United Stated Surgeon General's report and hence was not reflected in that report.

c) Addison Yeaman, General Counsel at Brown & Williamson, summarized his view about nicotine in a 1963 internal memorandum:

Moreover, nicotine is addictive. We are, then, in the business of selling nicotine, an addictive drug....

d) Internal reports prepared by Philip Morris in 1972 and the Philip Morris U.S.A. Research Center in March 1978 demonstrate Philip Morris' understanding of the role of nicotine in tobacco use: "We think that most smokers can be considered nicotine seekers, for the pharmacological effect of nicotine is one of the rewards that come from smoking. When the smoker quits, he forgoes his accustomed nicotine. The change is very noticeable, he misses the reward, and so he returns to smoking."

e) In a 1972 document entitled "RJR Confidential Research Planning Memorandum on the Nature of the Tobacco Business and the Crucial Role of Nicotine Therein," and RJR executive wrote:

In a sense, the tobacco industry may be thought of as being a specialized, highly ritualized, and stylized segment of the pharmaceutical industry. Tobacco products uniquely contain and deliver nicotine, a potent drug with a variety of physiological effects.

(*Id.* at ¶ 60).

Plaintiffs additionally contend that the tobacco companies were not only aware of the dangers and the addictive quality of nicotine, but that they controlled the level of nicotine in their products. (*Id.* at ¶ 66). In support of this, Plaintiffs cite specific instances in which the tobacco companies expressly denied the addictive quality of nicotine. (*Id.* at ¶ 69). Plaintiffs also cite to excerpts from the Waxman Subcommittee on March 25, 1994 and June 21, 1994, in which Dr. David Kessler testified that tobacco companies manipulated nicotine levels in their products, and bred tobacco to achieve specific nicotine levels. The following excerpts from the Third Amended Complaint are examples:

70. On March 25, 1994, David Kessler testified before the Waxman Subcommittee that "the cigarette industry has attempted to frame the debate on smoking as the right of each American to choose. The question we must ask is where smokers really have the choice." Dr. Kessler stated:

a) "Accumulating evidence suggests that cigarette manufacturers may intend this result—that they may be controlling the levels of nicotine in their products in a manner that creates and sustains an addiction in the vast majority of smokers."

b) "We have information strongly suggesting that the amount of nicotine in a cigarette is there by design."

c) "[T]he public thinks of cigarettes as simply blended tobacco rolled in paper. But they are much more than that. Some of today's cigarettes may, in fact, qualify as high technology nic-

otine delivery systems that deliver nicotine in precisely calculated quantities—quantities that are more than sufficient to create and sustain addition [sic] in the vast majority of individual who smoke regularly."

d) "[T]he history of the tobacco industry is a story of how a product that may at one time have been a simple agricultural commodity appears to have become a nicotine delivery system."

e) "[T]he cigarette industry has developed enormously sophisticated methods for manipulating nicotine levels in cigarettes."

f) "In many cigarettes today, the amount of nicotine present is a result of choice, not chance. [S]ince the technology apparently exists to reduce nicotine in cigarettes to insignificant levels, why, one is led to ask, does the industry keep nicotine in cigarettes at all?"

71. On June 21, 1994, Dr. Kessler told the Waxman Subcommittee that FDA investigators had discovered that Brown & Williamson had developed a high nicotine tobacco plant, which the company called Y-1. This discovery followed Brown & Williamson's flat denial to the FDA on May 2, 1994, that it had engaged in "any breeding of tobacco for high or low nicotine levels."

72. When four FDA investigators visited the Brown & Williamson plant in Macon, Georgia on May 3, 1994, Brown & Williamson officials denied that the company was involved in breeding tobacco for specific nicotine levels.

73. In fact, in a decade-long project, Brown & Williamson secretly developed a generically engineered tobacco plant with a nicotine content more than twice the average found naturally in flue-cured tobacco. Brown & Williamson took out a Brazilian patent for the new plant, which was printed in Portuguese. Brown & Williamson and a Brazilian sister company, Souza Cruz Overseas, grew Y-1 in Brazil an shipped it to the United States where it was used in five Brown & Williamson cigarette brands sold in Ohio, including three labeled "light." When the company's deception was uncovered, company officials stated that nearly four million pounds of Y-1 were stored in company warehouses in the United States.

74. As part of its cover-up, Brown & Williamson even went so far as to instruct the DNA Plant Technology Corporation of Oakland, California, which had developed Y-1, to tell FDA investigators that Y-1 had "never [been] commercialized." Only after the FDA discovered two United States Customs Service invoices indicting that "more than a million pounds" of Y-1 tobacco had been shipped to Brown & Williamson on September 21, 1992, did the company admit that it had developed the high-nicotine tobacco.

75. The public is only now learning of the measures taken by the Tobacco Industry to misrepresent, omit and conceal the truth about nicotine. On March 31, 1994, Congressman Waxman released a copy of a previously secret Philip Morris-funded research study substantiating the addictive nature of nicotine. Philip Morris scientists, upon conducting tests, found strong evidence concerning the addictive nature of nicotine, which suggested that further testing should be done. The experiment used in the study—self-administration by rats—is one of the primary tests used by the U.S. Food and Drug Administration, the U.S. Drug Enforcement Agency and the World Health Organization to determine whether a drug is addictive. The research was submitted in 1983 to the scientific journal *Psychopharmacology* and was accepted for publication. Prior to publication, the journal was notified by the scientist that the article was being withdrawn citing "factors beyond my control." The scientist subsequently left Philip Morris and in 1986 resubmitted a revised version of the article to the journal. After the article was again accepted for publication, the scientist was

again forced to withdraw it by Philip Morris.

(*Id.* at ¶¶ 70–75).

As indicated earlier, Defendants have filed their joint motion to dismiss (Docket No. 38) under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.[2] Plaintiffs have filed their motion for relief from judgment (Docket No. 41–1) of the dismissal of Tobacco Institute, or in the alternative a motion for judgment under Fed.R.Civ.P. 54(b) (Docket No. 41–2). Additionally, Plaintiffs have filed their motion for certification of two questions to the Ohio Supreme Court (Docket No. 43). Finally, Plaintiffs have filed a motion (Docket No. 71) for leave to present additional information in support of Plaintiffs' motion for relief from judgment. All motions have been thoroughly briefed by both sides, and, after careful review, the Court is ready to rule.

## III. STANDARD FOR MOTION TO DISMISS

"A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted)). When a complaint is challenged under Fed.R.Civ.P. 12(b)(6), its allegations should be construed favorably to the plaintiff, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and its factual allegations, "construed as to do substantial justice," Fed. R.Civ.P. 8(f), must be accepted as true. *See United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Hishon,* 467 U.S. at 73, 104 S.Ct. 2229; *Conley,* 355 U.S. at 48, 78 S.Ct. 99. *See also Hospital Bldg. Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) ("take as true the material facts alleged"). The sufficiency of a complaint, how-

ever, is a question of law, *Dugan v. Brooks,* 818 F.2d 513, 516 (6th Cir.1987), and the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987) (citations omitted).

In general, notice pleading under the Federal Rules "do[es] not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. 99 (failure of complaint to set forth specific facts to support its general allegations of discrimination was not a sufficient ground for dismissal of the suit) (footnote citing Fed.R.Civ.P. 8(a)(2)). Except for two specific instances as provided by Fed. R.Civ.P. 9(b) for fraud and mistake, notice pleading under Fed.R.Civ.P. 8(a) does not require greater particularity. *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (greater particularity not required even where municipal liability is alleged).

## IV. DISCUSSION

The Court will now discuss each of the four pending motions individually.

### A. Motion to Dismiss

#### 1. Defendants' Position

Defendants argue that the Ohio Product Liability Act applies to Plaintiffs' claims of strict liability, failure to warn, warranty and design defect. Defendants assert that under this Act, they cannot be held liable in this action because the risks associated with cigarette smoking have long been within the common knowledge of the community. For support, Defendants cite to *Paugh v. R.J. Reynolds Tobacco Co.,* 834 F.Supp. 228 (N.D.Ohio 1993) (Aldrich, J.).

---

2. While Defendants' motions to dismiss were filed prior to Plaintiffs' filing of the Third Amended Complaints, by stipulation of the parties and Order of this Court (Docket No. 69), the motions to dismiss and all briefs in opposition thereto and reply briefs were held to apply to the Third Amended Complaints, and the defendants were granted leave to file supplementary briefs in support of their motions to dismiss.

Defendants also argue that Plaintiffs' fraud and misrepresentation claims fail for three reasons: (1) the claims are not viable under the Ohio Product Liability Act; (2) Plaintiffs cannot plead or demonstrate justifiable reliance; and (3) Plaintiffs have failed to plead fraud with particularity as is required under Fed.R.Civ.P. 9(b).

Defendants further argue that Plaintiffs' implied warranty claim fails because under Ohio law, a common law product liability theory of implied warranty theory does not exist separate and apart from the product liability theory of strict liability claims recognized by the Ohio Product Liability Act.

Additionally, Defendants argue that the claims of "conspiracy and concerted action," "damages" claims, and loss of consortium claims are derivative and must fail in the fact of the meritlessness of the principal claims.

Finally, Defendants argue that, alternatively, under *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), Plaintiffs' claims should be dismissed because they are preempted by the Federal Cigarette Labeling and Advertising Act of 1969.

## 2. Plaintiffs' Position

Plaintiffs counter that the common knowledge doctrine does not bar their claims here because, due to Defendants' misleading and deceptive reports obscuring the truth about the hazards of smoking, the fact that cigarettes were so harmful was not, and could not have been, known by the ordinary person possessing the ordinary knowledge common to the community.

Plaintiffs further argue that their common law fraud claim is valid because Defendants made consistent misrepresentations of the safety of cigarettes to the public at large while Defendants knew that cigarettes were in fact harmful to a person's health. Plaintiffs rely on recently disclosed internal Tobacco Industry documents to show that the industry was aware of the harm of cigarettes but distorted the scientific record in order to promote sales. Further, Plaintiffs assert that this fraud claim was adequately plead

under Fed.R.Civ.P. 9(b) by their Third Amended Complaint.

Finally, Plaintiffs argue that, contrary to Defendants' position, the Ohio Product Liability Act does not abrogate the common law implied warranty action.

### 3. Analysis

#### a. The Product Liability Claims

The Court concludes that a number of Plaintiffs' claims are governed by the Ohio Product Liability Act ("the Act"). The Act governs "product liability claims" filed on or after January 5, 1988. Ohio Rev.Code §§ 2307.72(A), (B). The Act states that a "product liability claim" is any claim for:

[D]eath, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:

(1) The design, formulation, production, construction, creation, assembly, rebuilding, testing or marketing of that product;

(2) Any warning or instruction, or lack of warning or instruction, associated with that product;

(3) Any failure of that product to conform to any relevant representation or warranty.

Ohio Rev.Code § 2307.71(M).

■■■ Under this definition, and after careful review of Plaintiffs' Third Amended Complaint, the Court holds that the following causes of action brought by Plaintiffs are governed by the Act:

(1) "Strict liability" (Third Amended Compl. ¶¶ 26–31), which purports to state a claim under a number of theories, including the manufacture and sale of cigarettes in an "unsafe and defective condition at the time they left the possession of each of the Defendants" (*Id.* at ¶ 28), and the "failure to provide adequate warnings regarding the adverse health consequences of cigarette smoking." (*Id.* at ¶ 30).

(2) "Negligent, wilful and wanton misconduct" (*Id.* at ¶¶ 32–34), which purports to state this claim based on both the "manner

in which [the defendants] tested, researched, sold, promoted, and advertised the cigarettes that they manufactured and sold" (*Id.* at ¶ 33); and based on the defendants' "failing to adequately warn of the adverse health consequences of cigarette smoking." (*Id.* at ¶ 34).

(3) "Fraud and misrepresentation" (*Id.* at ¶¶ 35–85) based on § 2307.76 of the Act.[3] This Court construes these paragraphs to be a claim under the Act by virtue of the fact that they amount to an inadequate warning claim, as expressed as follows:

> Because of the fraudulent and active concealment and omission of the wrongdoing by Defendants, including deliberate efforts—which continue to this day—to give Plaintiff the materially false impression that nicotine is not addictive and that Defendants are not manipulating the nicotine levels of their cigarettes, Plaintiff could not reasonably have discovered the wrongdoing at any time prior to the filing of the instant Complaint.

(*Id.* at ¶ 84).

(4) "Strict liability for misrepresentation" (*Id.* at ¶¶ 86–87), which is based on the allegation that "Defendants' products were defective as they did not conform, at the time they left the control of the manufacturers to the Defendants' representations regarding cigarettes as set forth herein (R.C. 2307.77)." (*Id.* at ¶ 86).

(5) "Express warranty" (*Id.* at ¶¶ 88–89), based on Plaintiffs' allegation that "Defendants breached the express warranty described above in that the cigarettes that they manufactured and sold in fact caused cancer and other severe adverse health consequences, including death." (*Id.* at ¶ 89).

Having determined that a majority of Plaintiffs' claims are governed by the Act, the Court must now examine whether these product liability claims are barred by the terms of the Act. Defendants argue that under § 2307.75(E) of the Act, design defect claims are barred for products whose risks

are common knowledge. This section provides as follows:

> A product is *not defective in design or formulation* if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is *recognized by the ordinary person with the ordinary knowledge common to the community.*

(emphasis added).

Additionally, Defendants argue that under § 2307.76(B) of the Act, common knowledge of a product's inherent risks precludes liability under a failure to warn theory as well. This section provides as follows:

> A product is *not defective* due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a *risk that is a matter of common knowledge.*

(emphasis added).

■ Accordingly, the question for the Court is whether the harm posed by tobacco was, at the pertinent times to these lawsuits, a "matter of common knowledge," thus barring Plaintiffs' claims under the Act. While the answer cannot be found in the Act itself, Defendants argue that the Act nonetheless codified the principles of a section of the Restatement (Second) of Torts, which would bar liability. Specifically, Defendants argue that comment *i* to § 402A of the Restatement applies to the Act, and holds that no liability can be imposed for harm caused by ordinary cigarettes. Comment *i* reads as follows:

> Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini, as an instrument of torture. That is

---

**3.** The Court emphasizes that Plaintiffs' "Fraud and misrepresentation" claim under ¶¶ 35–85 which is based on common law fraud is *not* governed by the Act, and will be discussed separately below.

not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.* Good whisky is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whisky, containing a dangerous amount of fusel oil, is unreasonably dangerous. *Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous.*

(emphasis added).

Defendants then cite to a number of state court decisions for the proposition that comment *i* was adopted by the Ohio Product Liability Act. Most important for this discussion, however, Defendants cite to a decision from the Sixth Circuit, as applied in a decision from this district, holding that comment *i* applied to a claim against tobacco companies: *Paugh v. R.J. Reynolds Tobacco Co.*, 834 F.Supp. 228 (N.D.Ohio 1993) (Aldrich, J.). In *Paugh*, Judge Aldrich, ruling on a Rule 12(b)(6) motion to dismiss, stated as follows:

> The dangers posed by tobacco smoking have long been within the ordinary knowledge common to the community. In fact, tobacco is specifically mentioned in the Restatement (Second) of Torts as an example of a product which is not defective merely because the effects of smoking may be harmful. Rest. (2d) of Torts § 402A(i). The Sixth Circuit has addressed this issue in a similar case in which that Court held that "the extensive information regarding the risks of smoking available to the public precluded the existence of a jury question as to whether cigarettes are unreasonably dangerous." *Roysdon v. R.J. Reynolds*, 849 F.2d 230, 236 (6th Cir.1988). Although the Court referred to the fact that the smoker's claims were limited to post–1974 smoking, the Court cited the district court's broader finding that "tobacco has been used for over 400 years and its char-

acteristics have also been fully explored. Knowledge that cigarette smoking is harmful to health is widespread and can be considered part of the common knowledge of the community." *Id.*, citing *Roysdon v. R.J. Reynolds*, 623 F.Supp. 1189, 1192. *See also Forster v. R.J. Reynolds*, D.C. No. 85–4294 (4th Judicial Dist.Minn., Feb. 13, 1990) (relying on *Roysdon* for the proposition that the hazards of cigarette smoking were common knowledge prior to 1966).

*Paugh, supra*, at 230–31. Thus, Defendants argue that the Sixth Circuit, in *Roysdon*, has ruled that the common knowledge doctrine precludes liability for the manufacture and sale of cigarettes, and that this Court, like the *Paugh* court, should apply that doctrine here, and dismiss Plaintiffs' claims.

This Court has had an opportunity to address both the *Paugh* and *Roysdon* decisions, in a case against the tobacco companies which remains pending before this Court: *Tompkin, et al. v. American Brands, Inc., et al.*, Case No. 5:94cv1302. In *Tompkin*, in a decision dated January 27, 1995, this Court denied the tobacco defendants' motion to dismiss on all grounds, declining to adopt the same argument made here today that the common knowledge doctrine barred the plaintiff's claims. This Court noted the decisions in *Paugh* and *Roysdon*, and their holdings that the harms of cigarette smoking were "common knowledge," but then distinguished the facts in those cases from the *Tompkin* facts. This Court held that *Roysdon* and *Paugh* could not be applied to *Tompkin* due to significant difference in the years each plaintiff smoked, which precluded an application of *Roysdon* to *Tompkin*.

Specifically, this Court noted that the *Tompkin* plaintiff smoked from 1950 to 1966, and was not diagnosed with lung cancer until 1992. In *Paugh*, however, the plaintiff's decedent smoked from 1940 until his death in 1990; and in *Roysdon*, the plaintiff smoked from 1946 until 1983. The *Tompkin* plaintiff therefore stopped smoking at a significantly earlier period of time. This Court then held that while it could arguably said that "it was common knowledge as far back as 1974 that smoking is hazardous to one's health, it does

not follow that it was also common knowledge in 1950 or in 1966." (footnote omitted). This Court explained that its reason for this statement was that on January 1, 1966, the Federal Cigarette Labeling and Advertising Act, Pub.L. No. 89–92, 79 Stat. 282 codified as amended at 15 U.S.C. §§ 1331 to 1340 ("Labeling Act") became effective. By passing the Labeling Act, Congress wanted to inform the public "that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes[.]" 15 U.S.C. § 1331.[4] Therefore, this Court held that it was not inconceivable that Mr. Tompkin would present evidence that he stopped smoking in 1966 due to the warning on the cigarette packages; and that would present a very different scenario than in the *Paugh* and *Roysdon* cases, where the plaintiffs were still smoking between 1974 and 1990, despite the Surgeon General's warning on cigarette packages that smoking is hazardous to one's health.

Against this background, this Court today is asked whether it was "common knowledge" when Plaintiffs here began smoking. Ms. Williams smoked from 1954–1990; Mr. Jones began smoking in 1968, and continues to this day. Given the fact that both of these plaintiffs smoked *after* the date at which the Surgeon General warned that smoking is dangerous to one's health, the facts of this case are similar to those presented in *Roysdon* and *Paugh*, and thus the doctrine of

common knowledge can be applied. This Court thus holds that due to the fact that Plaintiffs here smoked after 1966, the date at which a warning was first put on cigarettes, it is fair to say that Plaintiffs knew of the dangers of smoking.[5]

For these reasons, this Court finds it is not necessary to specifically address the question of whether comment *i* has been adopted in the Ohio Product Liability Act. As explained, this Court holds that Plaintiffs' product liability claims are barred for the reason that, as a matter of law, it was "common knowledge" that tobacco was harmful at the relevant time periods here by virtue of the warnings on cigarettes required by the Labeling Act. Therefore, Defendants' motion to dismiss is GRANTED with respect to the specific product liability claims listed by this Court on pages 16–17 of this opinion.

**b. "Fraud and misrepresentation" based on common law fraud (Third Amended Compl. ¶¶ 35–85).**

The Court construes ¶¶ 35–85 to state not only a claim under the Ohio Product Liability Act, which was discussed above, but also a claim for common law fraud which falls outside the Ohio Product Liability Act. The Court thus rejects Defendants' threshold argument that these paragraphs are merely a

---

4. This warning was strengthened in 1970 to read as follows: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." 15 U.S.C. § 1333 (1965), amended by 15 U.S.C. § 1333 (1970).

5. The Court here notes that Ms. Williams began smoking in 1954, which was eight years *before* the warnings were first put on cigarettes. Arguably, Ms. Williams could present evidence that she would have stopped smoking in 1966, after seeing the first warning, but that she was unable to due to the fact that she had already become addicted; and nonetheless, because of the date at which she started smoking, her case is more similar to *Tompkin,* and her claims from 1954–1966 should survive the motion to dismiss. However, the Court holds that whatever the reason that Ms. Williams continued to smoke in 1966, the fact that she *did* continue makes her case factually distinguishable from *Tompkin,* in which the only reason that the claim survived was because for the entire period that Mr. Tomp-

kin smoked, this Court could not say, as a matter of law, that the dangers of smoking were "common knowledge." Here, however, for a majority of the years that Ms. Williams smoked, this Court, following Sixth Circuit precedent of *Roysdon,* can say that the dangers of smoking were common knowledge. Thus, Ms. Williams continued to smoke despite the warnings that were on cigarettes, and so cannot now maintain a product liability claim. Further, to the extent that Ms. Williams would argue that she would have quit in 1966 because of the warnings, but was unable to because she was already addicted, the Court finds that this is more properly pursued as a part of the common law fraud claim, which is discussed below. This is because it is the common law fraud claim which attacks the alleged misinformation concerning the addictive quality of cigarettes, and which would be the basis of Ms. Williams' argument for not being able to quit in 1966.

"failure to warn" claim, governed solely by the Ohio Product Liability Act.[6]

■ This Court's reading of the complaint, and Plaintiffs' own characterization of the claim (Docket No. 66), clearly indicate that Plaintiffs' are asserting claims under both the Act and common law fraud. While Plaintiffs' claim under the Act amounts to a "failure to warn" claim which fails under the Act, the Court reads Plaintiffs' fraud and misrepresentation claim to be based not only on an alleged defect in the product, but also an allegation of common law fraud. *See* cited portions of Third Amended Compl., *supra,* at 710–713. Thus, this claim is not limited to a product liability claim, but includes the allegation that the defendants breached their general obligation not to deceive. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 524–30, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (recognizing distinction between fraud actions and actions based on smoking and health); *City and County of San Francisco v. Philip Morris, Inc.,* 957 F.Supp. 1130, 1140 (N.D.Cal.1997) ("California law recognizes a distinction between claims based on fraudulent conduct and claims based on defects in a product."). As a result, it is not barred by the Ohio Product Liability Act.

■ Plaintiffs' claim is governed by Ohio common law fraud. The elements of a claim for common law fraud in Ohio are:

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to wether it is true or false that knowledge may be inferred,

(d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the representation or concealment, and

(f) a resulting injury proximately caused by the reliance.

*Burr v. Board of County Commissioners of Stark County* (1986), 23 Ohio St.3d 69, 73, 491 N.E.2d 1101, *quoting Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 169, 462 N.E.2d 407. Nondisclosure gives rise to a claim for fraud where there is a duty to disclose, as described below:

a party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonably care to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.

*Miles v. McSwegin,* (1979) 58 Ohio St.2d 97, 100, 388 N.E.2d 1367; *see also Smith v. Patterson* (1877) 33 Ohio St. 70 (duty to speak does not depend on existence of a fiduciary relationship between the parties, and may arise in any situation where one party imposes confidence in the other because of that person's position and the party knows of the confidence). To state a claim for fraud, the party must also satisfy Federal Rule of Civil Procedure 9(b), which requires that "[in] all averments of fraud ... the circumstances constituting fraud shall be stated with particularity."

■ In the instant cases, the Third Amended Complaints allege approximately 50 new paragraphs of detailed allegations in an attempt to satisfy the particularity requirements. This Court has copied a number of these paragraphs above, in its discussion of the factual background of the case. *See* discussion, *supra,* at 710–713. Without restating Plaintiffs' entire complaint, the fraud count alleges that Defendants both misrepresented and omitted the addictive nature of nicotine in congressional testimony,

---

**6.** Defendants again cite to *Paugh, supra,* wherein the court construed a claim for "fraud" as a claim under the Ohio Product Liability Act for "failure to warn." This Court cannot know precisely what the fraud claims in *Paugh* were, but court's description of the fraud claims there indicate that they were in fact based solely on the failure to warn. Here, on the contrary, Plaintiffs' claims are grounded in more of the fraudulent actions of the defendants, rather than merely the product liability claims. Thus, given the differences in the complaints, following *Paugh* 's construction of the fraud claim as merely another product liability claim would be inappropriate.

the mass media and other communications to Plaintiffs, and that Defendants failed to disclose their manipulation of nicotine levels in cigarettes. (Third Amended Compl. ¶ 80). Plaintiffs allege that Defendants' internal memoranda indicates that Defendants knew of the addictive quality of nicotine, and that Defendants were attempting to manipulate it in their cigarettes. *See* discussion, *supra*, at 710–713. Plaintiffs further allege that Defendants' duty to disclose arose because of Defendants' sole access to nonpublic material facts, and Plaintiffs' inability to discover the addictive nature of nicotine. (Third Amended Compl. ¶ 79). Furthermore, Plaintiffs allege that they relied on the statements made by Defendants and cited to in their complaints. (*Id.* at ¶ 82) ("The misrepresentations, omissions and concealments were made deliberately, willfully, maliciously and/or recklessly with the intent to mislead Plaintiff into reliance upon them and were material in causing Plaintiff to purchase Defendants' cigarettes.").

Based upon the advertisements cited to by Plaintiffs in their Third Amended Complaints, this Court finds there to be a viable cause of action under common law fraud. The fraud is in the form of nondisclosure by Defendants for several decades, during which time Plaintiffs relied on what Defendants did not say: i.e. that nicotine is addictive, and that Defendants manipulated the level of nicotine in their products. The congressional testimony cited to by Plaintiffs in their Third Amended Complaint implies that Defendants have never admitted publicly that nicotine is addictive. This supports a claim for fraud. *See Witherspoon v. Philip Morris Incorporated,* 964 F.Supp. 455 (D.D.C.1997) (holding plaintiff stated fraud by nondisclosure claim by alleging tobacco company was aware of, but failed to disclose, both that nicotine was addictive, and that tobacco company manipulated level of nicotine in products); *see also Burton v. R.J. Reynolds Tobacco Co.,* 884 F.Supp. 1515 (D.Kan.1995) (plaintiff's allegations that cigarette manufacturer had willfully concealed knowledge of fact that smoking caused cancer and vascular disease were sufficient to state claim for fraudulent concealment).

Plaintiffs have made a prima facie showing of common law fraud sufficient to survive Defendants' motion to dismiss. Plaintiffs have alleged specific dates, times, and descriptions of advertisements and representations made by the defendants during the time periods relevant here. Ms. Williams began smoking in 1954, at age 11, and quit in 1990. (Williams Third Amended Complaint ¶ 11). Mr. Jones began smoking in 1968, during his teenage years, and smokes to this day. (Jones Third Amended Complaint ¶ 11). Therefore, the relevant time period during which Plaintiffs began and continued smoking would be from 1954–1990 for Ms. Williams, and from 1968–present for Mr. Jones. The Court finds the complaints allege specific advertisements and representations made during these time periods. *See, e.g.,* Third Amended Complaint ¶¶ 47–51.

Furthermore, the information that has been discovered in recent years and which is set forth in Plaintiffs' complaint arguably implies the concealment of known facts of addiction and manipulation of the nicotine levels. (*Id.* at ¶¶ 54–75). Therefore, this Court cannot determine, on a motion to dismiss, that there was no duty to disclose here, where Plaintiffs have alleged that the statements were instrumental in their decision-making process, and they have alleged that Defendants knew of the incorrect information they were giving. *See Miles v. McSwegin, supra* (duty to speak if non-disclosing party "knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.")

As to the remaining element of common law fraud, "justifiable reliance upon the representation or concealment," Defendants argue that the "common knowledge" doctrine requires the dismissal of this claim, as well as the product liability claims. Defendants rely on the case of *Gawloski v. Miller Brewing Co.,* 96 Ohio App.3d 160, 644 N.E.2d 731 (Lorain App.1994), which held that the risks of alcohol are common knowledge, and therefore, the plaintiffs there could not demonstrate justifiable reliance on any alleged representations of the defendant beer manufacturers. However, this Court disagrees

that the tobacco litigation can properly be analogized to the alcohol litigation. The *Gawloski* litigation concerned the dangers of alcohol alone, without the allegations that the alcohol manufacturers manipulated the levels of alcohol, or covered up internal research that they themselves had done which showed dangers of their products. That, of course, is the central inquiry involved in the tobacco litigation, and Plaintiffs' specific allegations of just those actions clearly distinguishes this case from *Gawloski.*

On a motion to dismiss, this Court cannot say that under all the allegations in Plaintiffs' Third Amended Complaints, there is no set of circumstances which would support justifiable reliance. On the contrary, Plaintiffs have provided examples of Defendants' comments and representations that specifically suggested that even if other tobacco companies' products were dangerous, *theirs,* due to their research and experiments, were not. Such advertisements were arguably created to reduce smokers' fears of health risks, inducing their use of cigarettes. These allegations are therefore sufficient to demonstrate a prima facie showing of justifiable reliance.

Finally, this Court holds that the Third Amended Complaint sets forth the allegations with sufficient specificity, as required by Fed.R.Civ.P. 9(b). Plaintiffs have alleged specific dates and descriptions of representations made by Defendants; and Plaintiffs have alleged they relied on those representations in making their decisions to begin and continue smoking. Thus, the Court holds that the motion to dismiss the claim under common law fraud is hereby DENIED.

### c. "Implied warranty" (Third Amended Compl. ¶¶ 90–92).

Defendants argue that the claim of breach of implied warranties of merchantability and fitness for a particular purpose is not cognizable under Ohio law. Defendants argue that in *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 364 N.E.2d 267 (Ohio 1977), the Ohio Supreme Court ruled that Ohio's common law product liability theory of implied

warranty no longer exists separate and apart from the product liability theory of strict liability. Accordingly, argue Defendants, the claim for breach of implied warranty should fail under the common knowledge doctrine just as the claim for strict liability fails.

Plaintiffs, on the other hand, argue that this interpretation of Ohio is incorrect. Plaintiffs argue that every common law product liability cause of action survives the enactment of the Ohio Product Liability Act unless specifically eliminated by the Act. Thus, Plaintiffs argue, because the Act does not expressly eliminate the common law cause of action of implied warranties, these claims survive the Act, and survive this motion to dismiss.[7]

Upon review of the case law, this Court holds that the claim for breach of implied warranty is governed by the Ohio Product Liability Act, and therefore fails under the common knowledge doctrine. In *Temple v. Wean, supra,* at 320, 364 N.E.2d 267, the Ohio Supreme Court held that a claim for breach of implied warranty is "virtually indistinguishable" from a claim for strict liability in tort. Subsequently, the General Assembly passed the Ohio Product Liability Act. While not expressly mentioning claims for breach of implied warranty, the Act governs all claims for strict liability in tort. Therefore, courts faced with a claim for implied warranty have followed *Temple,* holding that a claim for implied warranty has been merged with a claim for strict liability in tort. *Ditto v. Monsanto Company,* 867 F.Supp. 585, 595 (N.D.Ohio 1993), *aff'd* 36 F.3d 1097, 1994 WL 508264 (6th Cir.1994); *see also Nadel v. Burger King Corporation,* 119 Ohio App.3d 578, 695 N.E.2d 1185, No. C–960489, 1997 WL 266762, at *3 (Hamilton 1997) (Ohio Product Liability Act has preempted claim for implied warranty), *appeal not allowed by* 80 Ohio St.3d 1415, 684 N.E.2d 706 (Ohio Oct. 1, 1997) (TABLE, NO. 97–1386); *Long v. Tokai Bank of California,* 114 Ohio App.3d 116, 127, 682 N.E.2d 1052 (Montgomery App.1996) (implied warranty claims governed by Ohio Product Liability

7. In fact, in another motion (Docket No. 43), which is discussed separately below, Plaintiffs argue that this issue concerning whether implied

warranty claims survive the Ohio Product Liability Act should be certified to the Ohio Supreme Court.

Act), appeal not allowed by 77 Ohio St.3d 1547, 674 N.E.2d 1186 (Ohio Jan. 29, 1997) (TABLE, NO. 96–2460).

In light of this line of authority, this Court holds that under Ohio law, the claim for breach of implied warranty has been merged with the claim for strict liability in tort, and is thus governed by the Ohio Product Liability Act. Accordingly, Plaintiffs' claims for breach of implied warranty fail for the reasons expressed above in connection with the product liability claims. Therefore, Defendants' motion to dismiss is GRANTED with respect to the implied warranty claims.

#### d. "Conspiracy and concerted action" (Third Amended Compl. ¶¶ 93–107).

 "Civil conspiracy" under Ohio law has been defined as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Minarik v. Nagy,* 8 Ohio App.2d 194, 196, 193 N.E.2d 280 (Cuyahoga App.1963) (citations omitted). However, it has long been established that an underlying tort is required in order for a civil conspiracy claim to be successful. *Id.,* at 195, 193 N.E.2d 280; *see also Gosden v. Louis,* 116 Ohio App.3d 195, 219, 687 N.E.2d 481 (Summit App.1996). Fraud committed by a party can serve as the underlying tort in the civil conspiracy. *Williams v. ITT Financial Services,* No. C–960234, 1997 WL 346137, *11 (WL Ohio App. 1997).

 Plaintiffs here claim that the defendant tobacco manufacturers conspired with the defendant Council for Tobacco Research–USA, Inc. to mislead the public concerning the harmful effects of smoking. The relevant paragraphs of Plaintiffs' complaints read as follows:

102. Each of the Manufacturer Defendants are members of the Council for Tobacco Research–USA, Inc., which was organized in 1954 by the tobacco industry including all the manufacturer Defendants, for the purposes of looking into and researching and doing investigative research as to the allegations of the ill effects of tobacco and cigarette smoking, and each of the manufacturer Defendants shared in the expense of the Council for Tobacco Research–USA, Inc, by paying their market share of the tobacco industry market. The Defendants and each of them paid into the Council for Tobacco research-USA, Inc., spending million [sic] of dollars in research and getting reports and having access to materials years before the general public knew of all the ill effects of tobacco products.

103. The Council for Tobacco Research–USA, Inc., in conjunction with the Tobacco Institute which was organized by the Manufacturer Defendants based on the market share of the tobacco industry, even after the health consequences of tobacco products and particularly smoking were clearly established, through its agents and employees and in conjunction with each of the Defendants, continued to put out information relative to the harmful effects of smoking that was designed to lead the public to underestimate the health consequences of smoking and to lead the public to believe that smoking does not have lethal consequences. The Council in concert with the Defendants has over the years put out misleading and false information knowing that it is misleading and false information.

(Third Amended Compl. ¶¶ 102–103). Further, in their complaints, Plaintiffs allege actual damages in the form of monetary damages as a result of Defendants' actions. (*Id.* at ¶¶ 108–113).

These allegations of conspiracy, together with the cognizable allegations of fraud, if taken as true for the present motion, fulfill the definition of "civil conspiracy" as set forth by Ohio law. Thus, the motion to dismiss is DENIED with respect to the civil conspiracy claims.[8]

8. However, the Court notes that a number of these claims refer to the Tobacco Institute, which

**B. Plaintiffs' Motion (Docket No. 41–1) for Relief from Judgment or in the alternative a Motion (Docket No. 41–2) for a Rule 54(b) Judgment, and Plaintiffs' related Motion (Docket No. 71) for Leave to Present Additional Information in Support of Plaintiffs' Motion for Relief From Judgment**

On July 9, 1997, this Court (Docket No. 33) granted a motion to dismiss the Tobacco Institute ("TI") for lack of jurisdiction. It is from this order that Plaintiffs move for either relief or for a final appealable order pursuant to Rule 54(b). Plaintiffs have also moved (Docket No. 71) for leave to present additional information in support of their motion for relief. The motion (Docket No. 71) for leave to present additional information is GRANTED, in order for the Court to allow Plaintiffs a full opportunity to present their case. However, a review of that new information reveals an insufficient basis for reconsideration of the dismissal of TI.

In this Court's order dismissing TI, the Court stated that its reasons were threefold: (1) "[U]nder the 'governmental contacts' rule, the activities of TI's contract lobbyists in Ohio cannot serve as a basis for personal jurisdiction over TI in this Court." (Docket No. 33, at 13). (2) TI's use of the national and Ohio media failed to establish the "continuous and systematic" dealings between Ohio and TI because "TI has not published any such articles or announcements in national publications for at least 15 years, thereby thwarting any claim of 'continuous' activity." (Docket No. 33, at 15) (footnote omitted). (3) The Sixth Circuit has declined to rule on the validity of the conspiracy theory of jurisdiction, and thus this Court did not apply this theory as a basis of jurisdiction over TI. (Docket No. 33, at 19).

A review of the new information presented by Plaintiffs in Docket No. 71, however, does not raise any new evidence which would demand the reconsideration of the dismissal of TI for the above listed reasons. Plaintiffs have not come forward with any current information which would satisfy the "continuous and systematic" requirements. In fact, the majority of the new information presented by Plaintiffs are documents from the 1950s—1970s, and nowhere is it offered that these documents were distributed in Ohio in a significant number, which would be required in order to support jurisdiction. One document (Docket No. 71, Ex. 25), an article from the Wall Street Journal, is from 1992, but this single instance is insufficient to serve as a basis for jurisdiction of TI, as mere publication in a forum does not subject the publisher to the jurisdiction of that forum. *See Keeton v. Hustler,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Therefore, in light of the fact that none of the new information provides a basis for extending this Court's jurisdiction over TI, Plaintiffs' motion for reconsideration (Docket No. 41–1) is hereby DENIED.

The alternative motion for a Rule 54(b) motion (Docket No. 41–2) is similarly DENIED because it is the Court's view that the conspiracy claim against TI is precisely the same conspiracy claim that remains pending against the remaining defendants. Thus, issuing a final appealable order to TI on a claim that remains pending would result in exactly the piecemeal appeal that courts should seek to avoid. *See Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). Under these facts, this Court finds no reason to delay these proceedings by allowing Plaintiffs to appeal the dismissal of TI in this piecemeal fashion.

was previously dismissed from this lawsuit for lack of personal jurisdiction. (Docket No. 33). Although TI is no longer a party to this litigation, it is obvious that these claims relate directly to the remaining defendants and therefore remain as viable allegations in this lawsuit as to the remaining defendants. *See* Third Amended Compl. ¶ 6 ("At all relevant times, The Tobacco Institute, Inc., was an agent and/or employee of the Tobacco Companies. In doing things alleged herein, The Tobacco Institute, Inc., was acting within the consent, permission, and authorization of each of the Tobacco Manufacturers. All actions of The Tobacco Institute, Inc., alleged herein were ratified and approved by the officers of managing agents of the Tobacco Manufacturers.")

### C. Plaintiffs' Motion to Certify Questions to the Ohio Supreme Court

Plaintiffs have moved this Court to certify the following two questions to the Ohio Supreme Court:

1. Strict liability applies where products are more dangerous than would be contemplated by the ordinary consumer, with the ordinary knowledge common to the community. The tobacco industry has systematically, purposefully, and publicly denied the link between smoking and disease. And the tobacco industry has consistently denied that cigarettes are addictive and questioned any reports suggesting any health risks from smoking. Does strict liability apply to cigarettes?

2. Common law products liability causes of action survive the enactment of the Ohio Products Liability Act unless specifically eliminated by the Act. Neither 2307.31(M) (the definition section) nor R.C. 2307.73 explicitly abolish common law negligence actions. Nothing in the Act specifically eliminates implied warranty claims. Do common law implied warranty claims survive the Products Liability Act?

(Docket No. 43, at 2).

The Court is of the view that there is no need to certify any questions to the Ohio Supreme Court. Plaintiffs' first question concerns the question of whether the "common knowledge" doctrine bars Plaintiffs' claims. After careful review, however, this Court finds there to be sufficient support from the Sixth Circuit to support this Court's decision that, at least for the time periods concerned in these two actions, the dangers of smoking were common knowledge. As set forth above, due to the fact that the Labeling Act began putting warnings on cigarettes in 1966, it was common knowledge from that point on, as a matter of law, that there was a danger associated with smoking. Because Ms. Williams continued smoking after the warnings were put on, and Mr. Jones *began* smoking *after* the warnings were put on, the dangers of smoking were common knowledge at the relevant periods of time concerned here. Thus, there is no reason to certify that question to the Ohio Supreme Court.

As to Plaintiffs' second question, the Court has explained above that it is satisfied that under Ohio law, as established by the Ohio Supreme Court, and applied by this court and the Sixth Circuit, claims for breach of implied warranty have been merged with claims for strict liability in tort, and thus fail for the same reason that the strict liability claims fail.

In conclusion, there is no need to certify these questions to the Ohio Supreme Court. Thus, Plaintiffs' motion (Docket No. 43) is DENIED.

### V. CONCLUSION

For the reasons set forth above, Defendants' motions (Case No. 5:97cv593, Docket No. 38; Case No. 5:97cv594, Docket No. 48) to dismiss Plaintiffs' complaints are GRANTED with respect to the product liability claims, and the claim for breach of implied warranty the motions are DENIED with respect to the claims under common law fraud, conspiracy and the derivative claims of loss of consortium.

Plaintiffs' motions (Case No. 5:97cv593, Docket Nos. 41–1 and 41–2; Case No. 5:97cv594, Docket Nos. 51–1 and 51–2) for relief from judgment, or in the alternative for a rule 54(b) judgment are DENIED. Plaintiffs motions (Case No. 5:97cv593, Docket No. 71; Case No. 5:97cv594, Docket No. 78) for leave to present additional information in support of the motion for relief from judgment are GRANTED.

Plaintiffs' motions (Case No. 5:97cv593, Docket No. 43; Case No. 5:97cv594, Docket No. 55) to certify questions of state law to the Ohio Supreme Court are DENIED.

As a result of the above, these cases will proceed only on Plaintiffs' claims of (1) common law fraud, as expressed in ¶¶ 35–85 of the Third Amended Complaint; (2) conspiracy, as expressed in ¶¶ 93–107 of the Third Amended Complaint, with the exception that TI is dismissed as a defendant; and (3) Mr. Williams' and Ms. Jones' claims for loss of consortium.

IT IS SO ORDERED.

## JUDGMENT ENTRY

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Defendants' motions (Case No. 5:97cv593, Docket No. 38; Case No. 5:97cv594, Docket No. 48) to dismiss Plaintiffs' complaints are GRANTED with respect to the product liability claims, and the claim for breach of implied warranty; the motions are DENIED with respect to the claims under common law fraud, conspiracy and the derivative claims of loss of consortium.

Plaintiffs' motions (Case No. 5:97cv593, Docket Nos. 41–1 and 41–2; Case No. 5:97cv594, Docket Nos. 51–1 and 51–2) for relief from judgment, or in the alternative for a rule 54(b) judgment are DENIED. Plaintiffs motions (Case No. 5:97cv593, Docket No. 71; Case No. 5:97cv594, Docket No. 78) for leave to present additional information in support of the motion for relief from judgment are GRANTED.

Plaintiffs' motions (Case No. 5:97cv593, Docket No. 43; Case No. 5:97cv594, Docket No. 55) to certify questions of state law to the Ohio Supreme Court are DENIED.

As a result of the above, these cases will proceed only on Plaintiffs' claims of (1) common law fraud, as expressed in ¶¶ 35–85 of the Third Amended Complaint; (2) conspiracy, as expressed in ¶¶ 93–107 of the Third Amended Complaint, with the exception that TI is dismissed as a defendant; and (3) Mr. Williams' and Ms. Jones' claims for loss of consortium.

IT IS SO ORDERED.