**NADEL et al., Appellants,**

**v.**

**BURGER KING CORPORATION et al., Appellees.**

[Cite as *Nadel v. Burger King Corp.* (1997), 119 Ohio App.3d 578.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–960489.

Decided May 21, 1997.

580

*Edward J. Felson* and *Stephen R. Felson,* for appellants.

*Jonathan P. Saxton,* for appellee Burger King Corporation.

*Droder & Miller Co., L.P.A., A. Dennis Miller* and *Kevin J. Ryan,* for appellee Emil, Inc.

PAINTER, Judge.

## I. Facts

On a morning in early December 1993, plaintiff-appellant Paul Nadel was driving his son, plaintiff-appellant Christopher, and two younger daughters, Ashley and Brittany, to school.[1] Paul's mother, plaintiff-appellant Evelyn Nadel, was seated next to the passenger window. Christopher was seated in the front seat between Evelyn and Paul, with one foot on the transmission hump and one foot on the passenger side of the hump. Brittany and Ashley were in the back seat. On the way, they ordered breakfast from the drive-through window of a Burger King restaurant owned and operated by defendant-appellee Emil, Inc. ("Emil") under a franchise agreement with defendant-appellee Burger King Corporation ("BK"). Paul's order included several breakfast sandwiches and drinks and two cups of coffee. The cups of coffee were fitted with lids and served in a cardboard container designed to hold four cups, with the two cups placed on opposite diagonal corners. Emil's employee served the coffee through the car window to Paul, who passed it to Christopher, who handed it to Evelyn.

---

1. We have *sua sponte* removed this case from the accelerated calendar.

Evelyn testified that she tasted the coffee in the cup on the right side of the container, by raising the flap on its lid, and found it too hot to drink. She also testified that the lid of the coffee "jiggled off" and burned her on her right leg after she lifted the flap. After bending the flap of the lid so that it was closed, Evelyn returned the cup, covered by the lid, to the container. She then either started to place the container of coffees on the floor next to Christopher's foot or placed the container on the dashboard, or she had already placed the container on the floor next to Christopher's foot, when Paul drove away from the restaurant, making a left turn onto a street. At that point Christopher began screaming that his foot was burned. Christopher, Paul, and Evelyn discovered that one or both of the cups had tipped, and that hot coffee had spilled on Christopher's right foot. Neither the cups, the lids, nor the container are in the record. Christopher was treated for second-degree burns on his right foot.

In their complaint, the Nadels (Brenda Nadel is the mother of Christopher Nadel) raised several claims, including (1) breach of a warranty of merchantability and breach of a warranty of fitness for a particular purpose, both based on the allegation that the coffee was too hot to consume, (2) products liability for a defective product and a failure to warn of the dangers of handling liquid served as hot as appellees' coffee, and (3) negligence both for failing to instruct employees how to properly serve hot coffee and for failing to warn business invitees of the danger of handling coffee at the temperature Emil's coffee was served.

Emil moved for summary judgment, claiming that no genuine issue of material fact existed. In support of its claim, Emil cited the deposition of Paul, in which he testified that he knew that coffee is served hot, that he expected coffee to be served hot, that he knew Emil's coffee was served hot, that coffee would burn someone if it was spilled on him or her, and that whoever was handling hot coffee needed to be careful not to spill it. Evelyn testified that she knew the coffee that was spilled was hot, and that it had burned her. Emil's owner's affidavit averred that BK's operating manual required coffee to be served at approximately one hundred seventy-five degrees, that the coffee machine thermostats were set at that temperature, and that Emil was unaware of any problems resulting from coffee being served at that temperature.

BK also moved for summary judgment and pointed to evidence in the depositions that appellants knew that the coffee was hot and that coffee was purchased and served as a hot beverage. It also contended that under the circumstances, Evelyn's and Paul's actions were intervening, superseding causes precluding any actionable negligence on its part.

In opposition to the motions for summary judgment, the Nadels argued that Emil and BK knew or should have known that second-degree burns could occur

as a result of coffee served at one hundred seventy-five degrees, because "the whole industry has long been aware of the danger of liquid this hot," and they cited several journal articles in their supporting memorandum. The Nadels also attached the affidavit of their attorney with Christopher's medical records affixed, which averred that the medical records were true copies of what was received through discovery.

The trial court granted both summary judgment motions, and the Nadels appealed. The trial court based its judgment on its conclusion that Christopher's injury resulting from spilled hot coffee was, as a matter of law, the result of intervening, superseding causes attributable to Paul and Evelyn. Appellants raise two assignments of error, contending, respectively, that the trial court improperly granted BK's summary judgment motion and Emil's summary judgment motion. We will address these assignments together, except in those instances where separate treatment is warranted for the various claims alleged by the Nadels.

## II. Standard of Review for the Nadels' Claims

In order to prevail on a motion for summary judgment, a movant has the burden to demonstrate that no genuine issue of material fact remains to be litigated, that it is entitled to judgment as a matter of law, and that it appears from the evidence, when viewed most strongly in favor of the nonmoving party, that reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 274. Where a moving party is seeking summary judgment on the basis that a nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claim by specifically pointing to some evidence of the type listed in Civ.R. 56 that affirmatively demonstrates that the nonmoving party has no evidence to support its claim. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274. Once this burden is met, the nonmoving party must then produce evidence on the issues for which it bears the burden at trial, by setting forth specific facts by the means listed in Civ.R. 56(C), demonstrating the existence of a triable issue of fact. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801.

## III. Intervening Cause

Here, the trial court granted summary judgment solely on the basis of its conclusion that Christopher's injury resulting from spilled hot coffee was, as a matter of law, the result of intervening, superseding causes attributable to Paul

and Evelyn. Only a reasonably unforeseeable action may constitute an intervening, superseding cause. See, *e.g., Leibreich v. A.J. Refrigeration, Inc.* (1993), 67 Ohio St.3d 266, 617 N.E.2d 1068. A spilled drink at fast-food windows or shortly after pulling away from fast-food windows occurs with enough frequency that it cannot be said to be so unforeseeable that it constitutes an intervening, superseding cause as a matter of law.[2] Therefore, the trial court erred when it held that the spill was an intervening, superseding cause on summary judgment. But we are permitted to affirm a correct judgment even though it was entered for the wrong reason, as only prejudicial error is reversible. See, *e.g., Cook v. Cincinnati* (1995), 103 Ohio App.3d 80, 658 N.E.2d 814, citing *State ex rel. Carter v. Schotten* (1994), 70 Ohio St.3d 89, 637 N.E.2d 306. Therefore, we must examine each claim as to each party, and determine whether summary judgment was otherwise proper.

## IV. Warranties of Merchantability and Fitness for a Particular Purpose

■ The Nadels' first claim alleges breaches of the warranty of merchantability and the warranty of fitness for a particular purpose. As no express contract is alleged between the parties, we assume that the asserted warranties are implied warranties set forth by the Ohio Uniform Commercial Code. See R.C. 1302.27 and 1302.28.[3] But the Ohio Products Liability Law has preempted the Nadels' warranty claims. R.C. 2307.72; 2307.73; *Saylor v. Providence Hosp.* (1996), 113 Ohio App.3d 1, 680 N.E.2d 193; Raitt, The Preemption and Economic Loss Provisions of the Ohio Product Liability Code (1991), 16 U.Dayton L.Rev. 583, 586–589; O'Reilly and Cody, Ohio Products Liability Manual (1992) 57, Section 5.05. R.C. 2307.72(A) states that "[a]ny recovery of compensatory damages

---

2. Intervening, superseding causes should not be confused with the editorial comments of the court in *Reese v. Burger King Restaurant* (Feb. 13, 1990), Franklin App. No. 89AP–856, unreported, 1990 WL 12383, which noted that causes of action under facts such as these should be limited. The *Reese* court held as a matter of law that the Burger King employees did not act unreasonably. Quite so, unless the temperature of the coffee they brewed and served was unreasonably hot, in light of the knowledge that customers do spill drinks from time to time.

3. Prior to the enactment of the Ohio Products Liability Law, R.C. 2307.71 to 2307.80, Ohio case law also recognized a theory of implied warranty based not on contract, but instead on "an action in tort for strict product liability similar to that recognized by Section 402A of the Restatement (Second) of Torts." 1 Ferriell, Ferriell Commercial Code (1996) 175, Section 10.10. This implied-warranty claim is no longer a viable cause of action for compensatory damages for personal injury due to a defective product. Raitt, The Preemption and Economic Loss Provisions of the Ohio Product Liability Code (1991), 16 U.Dayton L.Rev. 583, 586–587, fn. 15 and 17. A cause of action in tort for implied warranty is recognized for solely economic damages caused by a defective product. *LaPuma v. Collinwood Concrete* (1996), 75 Ohio St.3d 64, 661 N.E.2d 714.

based on a product liability claim" is subject to the Ohio Products Liability Law. R.C. 2307.73(A) states:

"A manufacturer is subject to liability for compensatory damages based on a product liability claim *only* if the claimant establishes, by a preponderance of the evidence, *all* of the following:

"(1) Subject to division (B) of this section, the product was defective in manufacture or construction *as described in section 2307.74 of the Revised Code,* was defective in design or formulation *as described in section 2307.75 of the Revised Code,* was defective due to inadequate warning or instruction *as described in section 2307.76 of the Revised Code,* or was defective because it did not conform to a representation made by the manufacturer *as described in section 2307.77 of the Revised Code.*

"*[AND]*

"(2) Subject to sections 2307.80, 2315.20, and 2323.59 of the Revised Code, a defective aspect of the product *as described in division (A)(1) of this section* was a proximate cause of harm for which the claimant seeks to recover compensatory damages.

"*[AND]*

"(3) The manufacturer designed, formulated, produced, created, made, constructed, assembled, or rebuilt the product." (Emphasis added.)

R.C. 2307.71(M) defines a product liability claim as a claim "asserted in a civil action and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product involved, that allegedly arise from any of the following:

"(1) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

"(2) Any warning or instruction, or lack of warning or instruction, associated with that product;

"(3) Any failure of that product to conform to any relevant representation or warranty."

Thus, claims for personal injuries caused by a product's failure to conform due to a defect is governed solely by the Products Liability Law. *LaPuma v. Collinwood Concrete* (1996), 75 Ohio St.3d 64, 661 N.E.2d 714. For a good explanation of the rationale behind this rule, see Raitt, *supra,* 16 U.Dayton L.Rev. at 586–586, fn. 15 and 17. Thus, we conclude that summary judgment was

proper for the claims for breach of warranties of merchantability and fitness for a particular purpose against both BK and Emil.[4]

## V. Products Liability

The Nadels argue two product liability claims: (1) design defect—that the coffee was excessively hot—and (2) the failure to warn of the danger of handling coffee served at that temperature. The law in Ohio governing design-defect claims states that defective designs are those in which the foreseeable risks exceed the benefits, *or* those that are more dangerous than "an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." R.C. 2307.75(A)(1) and (2).[5] See *Welch Sand & Gravel, Inc. v. O & K Trojan, Inc.* (1995), 107 Ohio App.3d 218, 224, 668 N.E.2d 529, 533. To support their claim that the temperature of the coffee constituted a defect, the Nadels presented evidence that the coffee was served at one hundred seventy-five degrees and that Christopher received second-degree burns when the coffee was spilled on him. The Nadels also provided, in their memorandum opposing summary judgment, citations to journals to support the allegation that one-hundred-seventy-five–degree coffee is excessively hot.

Generally, the determination of whether a design defect exists is a question of fact. See *Welch Sand & Gravel, Inc., supra,* 107 Ohio App.3d at 225, 668 N.E.2d at 534. Here, the question is not whether the Nadels expected it to be hot, but rather *how hot* they, or a reasonable consumer in their shoes, expected the coffee to be. If the Nadels could show that a reasonable consumer would find that coffee brewed at one hundred seventy-five degrees was unreasonably and excessively hot, and therefore that the coffee failed to be as safe as an ordinary consumer would expect, then a question of fact existed, and summary judgment was inappropriate. See, *e.g., Leichtamer v. Am. Motors Corp.* (1981), 67 Ohio St.2d 456, 21 O.O.3d 285, 424 N.E.2d 568. But the Nadels have failed to produce any evidence that the coffee was hotter than it was expected to be aside from the second-degree burns that Christopher Nadel suffered. The Nadels' citations to articles in their memorandum in opposition to summary judgment make interesting reading, but the articles have no evidentiary value.[6] Civ.R.

---

**4.** But, see, *Carrel v. Allied Products Corp.* (1997), 78 Ohio St.3d 284, 677 N.E.2d 795, which brings some of this rationale into question. However, we doubt that this case was intended to abrogate R.C. 2307.72(A) and 2307.73(A) *in toto.*

**5.** Note that the General Assembly has removed the consumer-expectations test, leaving only the risk-benefit test for products designed after January 27, 1997.

**6.** If the articles had evidentiary value, they might have at least served notice that the industry standard for coffee brewed at fast-food restaurants is roughly forty degrees hotter than coffee brewed in coffee machines at home.

56(C) allows a trial court to consider only "pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact," in deciding a summary judgment motion. The proper procedure for introducing evidentiary material not specifically authorized by the rule is to incorporate such material by reference in a properly framed affidavit. See *Biskupich v. Westbay Manor Nursing Home* (1986), 33 Ohio App.3d 220, 515 N.E.2d 632. Documents submitted in opposition to a motion for summary judgment that are neither sworn, certified, nor authenticated by affidavit have no evidentiary value. *Green v. B.F. Goodrich Co.* (1993), 85 Ohio App.3d 223, 228, 619 N.E.2d 497, 500–501. The articles cited by the Nadels are not even a part of the record, much less properly framed by an affidavit as required by the rule.

Nevertheless, we are convinced that a jury is better equipped to determine whether consumers expect coffee to be so hot that it would cause second-degree burns when spilled, or that its risk of second-degree burns would outweigh its benefit. The fact that the coffee caused second-degree burns is sufficient by itself to raise a factual issue whether the coffee was unreasonably hot, and therefore it is presently sufficient to defeat a motion for summary judgment.

The Nadels also claim that the coffee was defective because it failed even to contain a warning as to the danger of handling liquid served at one hundred seventy-five degrees. BK and Emil, through the depositions of Evelyn and Paul, presented evidence that the Nadels knew the coffee was hot and that they had ordered it hot. But this knowledge is not dispositive, because the issue is not whether the coffee was hot or expected to be hot, but whether the coffee was so exceedingly hot that serving it without a warning of unforeseen danger was unreasonable. We believe that it is a question of fact whether second-degree burns can result from spilled coffee is an unforeseen danger, and perhaps this is the sum of our disagreement with the dissenting opinion, which believes that such possibilities are common knowledge. R.C. 2307.76(B) provides that "[a] product is not defective due to lack of warning" as a result of the failure to warn about an open and obvious risk or a risk that is a matter of common knowledge. We are not so convinced that we will take judicial notice and remove this issue from a jury. We cannot conclude from the evidence before us that the hot coffee posed such an obvious danger of severe burns and that the Nadels were aware of such danger, although, with a more developed record, such facts could perhaps be demonstrated.

Thus, the issues of whether BK and/or Emil "knew or, in the exercise of reasonable care, should have known about a risk [second-degree burns] that is associated with the product" and whether BK and/or Emil failed to provide the warning that "a manufacturer exercising reasonable care would have provided

concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of the harm" should be reserved for the trier of fact. R.C. 2307.76(A).

As to BK's motion for summary judgment, BK alleges that it is immune under the statute because it is not a manufacturer, seller, or supplier of the coffee under R.C. 2307.71. But Emil stated via affidavit that it brewed and sold the coffee pursuant to BK's specifications *as required by the franchise agreement.*

 A principal-agent relationship exists when one party retains a right to control the actions of its agent and those actions are directed toward the attainment of an objective which the former party seeks. *Hanson v. Kynast* (1986), 24 Ohio St.3d 171, 24 OBR 403, 494 N.E.2d 1091, paragraph one of the syllabus. Under the doctrine of respondeat superior, a principal is vicariously liable for the acts of its agent committed within the scope of the agency. *Id.*

 Because BK at least arguably retains control over such details as the temperature that the coffee must be brewed, Emil could be considered an agent of BK with respect to those details. Under R.C. 2307.71(I), a manufacturer is "a person engaged in a business to design, formulate, produce, create, make, construct, assemble or rebuild a product or a component of a product." Emil makes the coffee to BK's specifications. Therefore, BK qualifies as a "manufacturer" under the definition in R.C. 2307.71(I) for summary judgment purposes, when every factual benefit of the doubt is given to the Nadels.

As to Emil's motion for summary judgment, Emil based its motion exclusively on its argument of intervening, superseding causation and the holding in *Reese, supra.* As we have already stated, these arguments are insufficient to sustain summary judgment on the failure-to-warn claim.

In sum, we hold that both the design-defect claim and the failure-to-warn claim survive BK's and Emil's motions for summary judgment, because issues of fact remain whether the coffee was defective due to the heat at which it was served, and whether a warning existed, and if so, whether it was adequate.

### VI. Claim of Negligence Toward Business Invitees

 The Nadels' next claim alleges that appellees violated their duty to the Nadels as business invitees by negligently failing to warn them of the danger of handling hot coffee. While such a claim usually is premised on the duty to maintain safe *premises* for a business invitee and to warn of a defect *on the property*, see *Albright v. Montgomery Inn, Inc.* (Aug. 16, 1995), Hamilton App. No. C–940747, unreported, 1995 WL 481485, a business proprietor has a duty to exercise ordinary and reasonable care to warn an invitee of latent defects *on the*

*property* of which the proprietor has knowledge or should have knowledge. See *Westwood v. Thrifty Boy* (1972), 29 Ohio St.2d 84, 86–87, 58 O.O.2d 154, 155–156, 278 N.E.2d 673, 675; *McGuire v. Sears, Roebuck & Co.* (1996), 118 Ohio App.3d 494, 693 N.E.2d 807. Because the failure to warn here involves a product, it more reasonably falls under the rubric of products liability rather than premises liability. Thus, we hold that the summary judgment was properly granted in favor of BK and Emil on this claim.

## VII. Negligent Infliction of Emotional Distress

Negligent infliction of emotional distress is a claim based upon the negligence of one party creating actionable emotional distress in another. *Heiner v. Moretuzzo* (1995), 73 Ohio St.3d 80, 652 N.E.2d 664, citing *Schultz v. Barberton Glass Co.* (1983), 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109. In *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, the Ohio Supreme Court stated in paragraph three of the syllabus:

"3. Where a bystander to an accident states a cause of action for negligent infliction of serious emotional distress, the emotional injuries sustained must be found to be both serious and reasonably foreseeable, in order to allow a recovery.

"3a. Serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."

Here, Evelyn and Paul Nadel, Christopher's grandmother and father respectively, are the ones making claims for negligent emotional distress. Yet the only evidence of any emotional distress as a result of the incident is (1) Evelyn's statement that she was "worried," though not enough to seek psychological treatment, and (2) Paul's statement that while receiving psychological treatment for depression resulting from his divorce and stress, the incident "came up," although it was not a contributing reason for seeking or receiving counseling. Absent from the record is any showing of the type of emotional distress where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case. Therefore, the trial court properly granted summary judgment with respect to this claim.

## VIII. Punitive Damages

Punitive damages in a products liability context are controlled by R.C. 2307.801. See, *e.g., Saylor, supra.* In order to prevail, the Nadels must demonstrate by clear and convincing evidence that they are entitled to compensatory damages on either their design-defect claim or their failure-to-warn claim, and that the harm was the result of misconduct of BK, Emil, or both, in their

capacity as a manufacturer or supplier, that manifested a flagrant disregard for the safety of persons who might be harmed by the product involved. R.C. 2307.801(A). Relevant factors include (1) the likelihood that serious harm would arise from the misconduct of the manufacturer or supplier, (2) the degree of the awareness of the manufacturer or supplier of that likelihood, (3) the duration of the misconduct and any concealment of it by the manufacturer or supplier, (4) the attitude and conduct of the manufacturer or supplier upon the discovery of the misconduct and whether the misconduct has terminated, and (5) the financial condition of the manufacturer or supplier. R.C. 2307.801(B).

 Although the record has little to support the Nadels' claim beyond the pleadings, the motions for summary judgment cite no specific reason based on the record for granting summary judgment on the punitive-damages claim as required under *Dresher, supra.* At this point, it is premature to grant summary judgment to either BK or Emil without further inquiry into these factors.

## IX. Conclusion

Accordingly, we affirm the trial court's summary judgment with respect to the claims based upon warranties of merchantability and fitness for a particular purpose, the claim of premises-related negligence and the claims of negligent infliction of emotional distress. With respect to the products liability claims and the related claims for punitive damages, we reverse the summary judgment and remand the cause for further proceedings consistent with this opinion on those claims.

*Judgment accordingly.*

DOAN, P.J., concurs.

HILDEBRANDT, J., concurs in part and dissents in part.

HILDEBRANDT, Judge, concurring in part and dissenting in part.

While I agree with the majority opinion as set forth in Sections III, V, and VI, I respectfully dissent from Sections IV and VII. The majority correctly notes that the Nadels failed to produce evidence beyond the burn-producing spill to defeat Emil's and BK's· motions for summary judgment regarding the Nadels' claim that the coffee was a defective product because its temperature was unreasonably and excessively hot. It holds nonetheless that the fact that the coffee caused second-degree burns is sufficient to create a genuine issue of material fact as to whether the coffee was a defective product and "whether the coffee was so exceedingly hot that serving it without a warning was unreasonable."

I disagree that the fact that Christopher suffered second-degree burns is sufficient to establish the existence of a disputed issue of material fact as to whether the coffee was a defective product under either prong of the defective-design section of Ohio's Products Liability Act. R.C. 2307.75(a)(1) and (2). The fact that a product may cause injury does not mean that the product is defective. Accord *Cincinnati Ins. Co. v. Volkswagen of Am.* (1985), 29 Ohio App.3d 58, 29 OBR 68, 502 N.E.2d 651. A manufacturer need not make its product accident-proof or foolproof. It is "not an insurer that [its] product is, from a design viewpoint, incapable of producing injury." *Gossett v. Chrysler Corp.* (C.A.6, 1966), 9 Ohio Misc. 1, 5, 36 O.O.2d 207, 210, 359 F.2d 84, 87. The majority opinion, by allowing the Nadels to meet their Civ.R. 56 burden by practically going no further than the mere allegation of wrongdoing creates an absolute liability on the manufacturer based on the fact that an injury occurs when its product is used. To accept the majority opinion would mean that one "would truly have reached the scenario envisioned by Justice Holmes in his dissent in *Cremeans* [*v. Internatl. Harvester Co.* (1983), 6 Ohio St.3d 232, 238, 6 OBR 302, 307, 452 N.E.2d 1281, 1286] where ' * * * summary judgment for a defendant would never be possible since the plaintiff need only assert that a given product is defectively designed and that he was injured by it.' " *King v. K.R. Wilson Co.* (1983), 8 Ohio St.3d 9, 11, 8 OBR 79, 80, 455 N.E.2d 1282, 1283 (Holmes, J., dissenting).

I also conclude that summary judgment was properly entered against the Nadels on their failure-to-warn claim, because the fact that coffee is hot and can cause burns is open and obvious. The evidence demonstrates that Evelyn and Paul knew the coffee was hot and that they had ordered it hot. In fact, coffee is usually served hot and allowed to cool before consumption. R.C. 2307.76(B) provides that "[a] product is not defective due to lack of warning" as a result of the failure to warn about "an open and obvious risk or a risk that is a matter of common knowledge."

The majority opinion focuses on the severity of the injury as the crux of whether a warning is required. I believe that "risk" is not to be so liberally construed. It is not the severity of a specific injury that constitutes the open and obvious risk; the open and obvious risk is the "danger or potentiality for danger" that a product possesses, regardless of the innumerable degrees of severity of injury which might occur. See Restatement of the Law 2d, Torts (1965) 353, Section 402A, Comment *j*.

"A manufacturer has no duty to warn of an obvious danger. Knives are sharp, bowling balls are heavy, bullets cause puncture wounds in flesh. The law has long recognized that obvious dangers are an excluded class. [Footnote deleted.] As the colorful Seventh Circuit Judge Richard Posner once wrote in an Indiana

federal case, if you 'go to the zoo and put your hand through the lion's cage, and the lion bites your hand off, * * * you do not have an action against the zoo.'" O'Reilly and Cody, Ohio Products Liability Manual (1992), Section 10.13, 147.

A knife may cause various degrees of injury ranging from the mere slicing of skin to the severing of a limb; however, the fact that the injury is a severing of a limb does not make the risk of causing some type of cutting any less obvious. Likewise coffee is served hot. The fact that its heat may cause a slight burn in some instances, or second-degree burns when, like in this case, the coffee is spilled and compressed between a child's sock and his skin for a period of time, does not make less obvious the risk that hot coffee purchased for consumption will burn upon contact with skin.[7] I would conclude that hot coffee is an open and obvious risk which requires no warning. Cf. *Koepke v. Crosman Arms Co.* (1989), 65 Ohio App.3d 1, 582 N.E.2d 1000 (no warning required regarding the dangers of firing a loaded BB gun toward a person); *Gawloski v. Miller Brewing Co.* (1994), 96 Ohio App.3d 160, 644 N.E.2d 731 (dangers of prolonged and excessive use of alcohol is a danger within the body of common knowledge); *Hanlon v. Lane* (1994), 98 Ohio App.3d 148, 648 N.E.2d 26 (no warning required of the danger of carbon monoxide where its lethality is a matter of common knowledge); *Taylor v. Yale & Towne Mfg. Co.* (1987), 36 Ohio App.3d 62, 520 N.E.2d 1375 (no claim for failure to warn where truck's propensity to spark was fairly obvious).

Because of my conclusion above, I also would overrule the Nadels' claims for punitive damages.

---

7. Under the majority's analysis, a question is thus raised as to what warning would be adequate. Obviously, if the danger is the severity of possible injury and not the fact that the coffee is hot, a warning of "Caution! Hot Coffee!" is arguably inadequate. Would a manufacturer have to determine the most severe injury which could occur under all circumstances and provide a warning of that possibility, so that if the instant case constituted that situation a warning to be sufficient would need to advise "Warning! Hot Coffee Can Cause Second–Degree Burns If Spilled In Sock!"?