**Angelina and Jack McMAHON, Plaintiffs–Appellants,**

v.

**BUNN–O–MATIC CORPORATION, James River Paper Company, and Wincup Holdings, L.P., Defendants–Appellees.**

No. 97–4131.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1998.

Decided July 2, 1998.

---

Robert J. Palmer (argued), May, Oberfell & Lorber, Edmond W. Foley, Foley & Small, South Bend, IN, for Plaintiffs–Appellants.

David Cerven (argued), Burke, Murphy, Costanza & Cuppy, East Chicago, IN, Defendant–Appellee.

Before BAUER, EASTERBROOK, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

During a break from a long-distance auto trip, Jack McMahon bought a cup of coffee from the mini mart at a Mobil station. Jack asked Angelina McMahon, his wife, to remove the plastic lid while he drove. Angelina decided to pour some of the coffee into a smaller cup that would be easier for Jack to handle. In the process the coffee flooded her lap; Angelina suffered second and third degree burns that caused her pain for months and produced scars on her left thigh and lower abdomen. Angelina believes that the Styrofoam cup collapsed, either because it was poorly made or because inordinately hot coffee weakened its structure. The McMahons' claims against the producers of the cup and lid have been settled. The third defendant is Bunn–O–Matic Corporation, which manufactured the coffee maker. According to the McMahons, the temperatures at which Bunn's apparatus brews and serves coffee—195° F during the brewing cycle and 179° F as the "holding" temperature of a carafe on its hotplate—are excessive, and its design therefore defective.

The McMahons filed suit in state court. Bunn–O–Matic removed it to federal court under 28 U.S.C. § 1441(a), asserting that the district court would have had original jurisdiction. Removal was improper, because only Bunn among the three defendants signed the notice. But no one paid any attention to the requirement that all defendants (or none) join a notice of removal, see *Hanrick v. Hanrick*, 153 U.S. 192, 14 S.Ct. 835, 38 L.Ed. 685 (1894); *Torrence v. Shedd*, 144 U.S. 527, 12 S.Ct. 726, 36 L.Ed. 528 (1892); *Roe v. O'Donohue*, 38 F.3d 298 (7th Cir.1994), and any defect in the removal process other than the lack of subject-matter jurisdiction must be raised within 30 days or is forfeited. 28 U.S.C. § 1447(c). As it happens, no one paid attention to subject-matter jurisdiction either. Bunn's notice of removal states that it is a Delaware corporation with its principal place of business in Illinois and that the McMahons are residents of Indiana. An allegation of residence is inadequate. *Steigleder v. McQuesten*, 198 U.S. 141, 25 S.Ct. 616, 49 L.Ed. 986 (1905). Of what state are the McMahons citizens? And what about the other two defendants? One is a limited partnership, a notorious source of jurisdictional complications. See *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990); *Guaranty National Title Co. v. J.E.G. Associates*, 101 F.3d 57 (7th Cir.1996); *America's Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072 (7th Cir.1992). The notice of removal did not mention their citizenships, yet no one gave jurisdiction a second thought. James River Paper Company and Wincup Holdings, L.P., did not bother to put the details of their own citizenships into the record, and the district court neither assured itself that jurisdiction exists nor flagged the issue for the parties' attention. On appeal Bunn and the McMahons did not comply with Circuit Rule 28(a)(1), which reads in part:

If jurisdiction depends on diversity of citizenship, the [jurisdictional] statement [in each party's brief] shall identify the jurisdictional amount and the citizenship of each party to the litigation. If any party is a corporation, the statement shall identify both the state of incorporation and the state in which the corporation has its prin-

cipal place of business. If any party is an unincorporated association or partnership the statement shall identify the citizenship of all members.

The jurisdictional statements covered Bunn and the McMahons but neglected the other two parties. When the subject arose at oral argument, both sides reacted as if the thought that *all* parties' citizenship matters was a revelation.

■ After a false start, Bunn has filed a proposed amendment to the notice of removal to put the jurisdictional details in the record. See 28 U.S.C. § 1653. As amended, the notice alleges that the McMahons are citizens of Indiana and that on the date of removal James River Paper Company was incorporated in Virginia and had its principal place of business there, and that Wincup Holdings, L.P., had two partners: its general partner was Wincup Holdings, Inc., and its limited partner was James River Paper Company. According to the amended notice, Wincup Holdings, Inc., was incorporated in Delaware and had its principal place of business in Arizona. These facts—we have no reason to doubt that they *are* facts—mean that the suit comes within federal jurisdiction under § 1332(a)(1). The motion to amend the pleadings under § 1653 to show the existence of jurisdiction is accordingly granted, and we move on to the merits—with a reminder to the district court and future litigants that it is best to attend to this issue at the outset, before unpleasant discoveries about jurisdictional facts require the parties and the judge to bemoan the waste of the time and money invested in the litigation.

The McMahons have two theories of liability under Indiana law (which the parties agree supplies the rule of decision): (i) that Bunn failed to warn consumers about the severity of burns that hot coffee can produce; and (ii) that any coffee served at more than 140° F is unfit for human consumption (and therefore a defective product) because of its power to cause burns more severe than consumers expect, aggravated by its potential to damage the cup and thus increase the probability of spills. After the parties agreed to accept the decision of a magistrate judge, see 28 U.S.C. § 636(c), the court entered summary judgment for the defendants. 1997 U.S. Dist. Lexis 22318. The magistrate judge observed that both McMahons conceded during their depositions that "hotness" was one of the elements they value in coffee and that they sought out hot coffee, knew it could burn, and took precautions as a result. These concessions—which any adult coffee drinker is bound to make—foreclose the possibility of recovery, the opinion concluded. Other, similar suits have come to the same summary end, see *Barnett v. Leiserv, Inc.*, 968 F.Supp. 690 (N.D.Ga.), affirmed without opinion, 137 F.3d 1356 (11th Cir.1998); *Greene v. Boddie-Noell Enterprises, Inc.*, 966 F.Supp. 416 (W.D.Va.1997); *Lamkin v. Braniff Airlines, Inc.*, 853 F.Supp. 30 (D.Mass.1994); *Oubre v. E-Z Serve Corp.*, 713 So.2d 818 (5th Cir.1998); *Huppe v. Twenty-First Century Restaurants of America, Inc.*, 130 Misc.2d 736, 497 N.Y.S.2d 306 (N.Y.Sup.1985), although one published opinion has held that a claim of this sort is triable, see *Nadel v. Burger King Corp.*, 119 Ohio App.3d 578, 695 N.E.2d 1185 1997 Ohio App. Lexis 2144 (1st Dist.), review denied, 80 Ohio St.3d 1415, 684 N.E.2d 706 (1997), and a suit in New Mexico (*Liebeck v. McDonald's Restaurants, P.T.S., Inc.*) produced a widely publicized jury verdict of some $3 million but not a published opinion (the case was settled before appeal).

Before taking up the McMahons' objections to the district court's conclusions, we offer a prefatory note about the parties' litigation strategy. Plaintiffs proceed on the assumption that Bunn–OMatic made and sold *coffee*, as opposed to a tool that retailers use to make coffee. Bunn's failure to challenge this perspective is puzzling. Why should a tool supplier be liable in tort for injury caused by a product made from that tool? If a restaurant fails to cook food properly and a guest comes down with food poisoning, is the oven's manufacturer liable? Our concern is rooted not in the privity doctrine of bygone years but in the belief that tort doctrine must reflect the way in which different actors cooperate to improve safety. Consider the plaintiffs' claim that they should have received warnings. How is a manufacturer of

coffee-making machines to deliver them? Many consumers of coffee never see the machine that made it—someone brings coffee to the customer in a cup or pot (as in *Lamkin*); a fast food outlet may deliver a sealed container to a take-out window (as in *Greene* and *Nadel*) or place the coffee maker so far behind the counter that customers cannot read whatever warnings it bears. And coffee makers are small; where would a warning more elaborate than "**Hot!**" go? If warnings are in order, then, they belong on a restaurant's menu, or on the cups containing take-out coffee. Consider, too, plaintiffs' contention that hot coffee is extra dangerous to take-out customers who are more likely to spill it, or because it destabilizes Styrofoam cups. What has this to do with the claim that a *machine* is defective, as opposed to a claim that the vendor used the wrong machine for the job? Restaurants that serve coffee in china cups would not worry about the effect of a liquid's temperature on foam, or about the jostling of a moving car. They could serve at whatever temperatures their clientele preferred. Thus it cannot be that producing hot liquids makes a machine defective any more than a knife is defective because its blade is sharp; the theory has to be that vendors with a more mobile trade and weaker cups must use machines that brew and hold coffee at lower temperatures (or must use cups capable of holding liquids at the temperatures they have chosen to serve). Perhaps Bunn advertised the machine used by the Mobil station as suitable to businesses serving carry-out coffee in flimsy cups; that would be a better basis of liability, but it is not one to which plaintiffs advert. Still, both sides in this case treat Bunn and the retailer as identical. We proceed on that basis, while doubting that it is sound.

■ Let us tackle the contention that Bunn should have warned the McMahons about the dangers of hot coffee. What would this warning have entailed? A statement that coffee is served hot? That it can cause burns? They already knew these things and did not need to be reminded (as both conceded in their depositions). See American Law Institute, *Restatement of Torts: Products Liability* § 2 comment *j* (Proposed Final Draft 1997). That this coffee was *unusu-*

*ally* hot and therefore capable of causing severe burns? Warning consumers about a surprising feature that is potentially dangerous yet hard to observe could be useful, but the record lacks any evidence that 179° F *is* unusually hot for coffee. Neither side submitted evidence about the range of temperatures used by commercial coffee makers, or even about the range of temperatures for Bunn's line of products. The McMahons essentially ask us to take judicial notice that 179° is abnormal, but this is not the sort of incontestable fact for which proof is unnecessary. In *Barnett* and *Oubre* the courts reported that the industry-standard serving temperature is between 175° and 185° F, and if this is so then the McMahons' coffee held no surprises. What is more, most consumers prepare and consume hotter beverages at home. Angelina McMahon is a tea drinker, and tea is prepared by pouring boiling water over tea leaves. Until 20 years ago most home coffee was made in percolators, where the water boiled during the brewing cycle and took some time to cool below 180°. Apparently the McMahons believe that home drip brewing machines now in common use are much cooler, but the record does not support this, and a little digging on our own part turned up ANSI/AHAM CM–1–1986, which the American National Standards Institute adopted for home coffee makers. Standard 5.2.1 provides:

> On completion of the brewing cycle and within a 2 minute interval, the beverage temperature in the dispensing vessel of the coffee maker while stirring should be between the limits of 170° F and 205° F (77° C and 96° C).

> The upper finished brew temperature limit assures that the coffee does not reach the boiling point which can affect the taste and aroma. The lower temperature limit assures generally acceptable drinking temperature when pouring into a cold cup, adding cream, sugar and spoon.

Standard 5.2.3.2 adds, for any coffee maker that "incorporates means to maintain beverage temperature on completion of a brewing cycle":

With the appliance containing maximum rated cup capacity of liquid, basket and pump removed (if present), allow to stand while still energized in an ambient temperature of 73 ± 9° F (23 ± 5° C) for a period of 1 hour at which time the beverage temperature in the appliance should not be lower than 170° F (76.7° C).

Thus home coffee makers that claim to follow the standard (a voluntary step; no statute or regulation requires compliance) must brew and hold coffee at a temperature that does not fall below 170°. Coffee served at 180° by a roadside vendor, which doubtless expects that it will cool during the longer interval before consumption, does not seem so abnormal as to require a heads-up warning.

■ What remains is the argument that Bunn should have provided a detailed warning about the *severity* of burns that hot liquids can cause, even if 179° F is a standard serving temperature. The McMahons insist that, although they knew that coffee can burn, they thought that the sort of burn involved would be a blister painful for several days (that is, a second degree burn), not a third degree burn of the sort Angelina experienced. An affidavit submitted by Kenneth R. Diller, a professor of biomedical and biomechanical engineering, observed that "full thickness third degree burn injuries would *require* 60 seconds of exposure [to a liquid at] 140° F, but only 3 seconds of exposure at 179° F." We may assume that ordinary consumers do not know this—that, indeed, ordinary consumers do not know what a "full thickness third degree burn" is. But how, precisely, is this information to be conveyed by a coffee maker? Bunn can't deliver a medical education with each cup of coffee. Any person severely injured by any product could make a claim, at least as plausible as the McMahons', that they did not recognize the risks *ex ante* as clearly as they do after the accident.

Insistence on more detail can make any warning, however elaborate, seem inadequate. Indiana courts have expressed considerable reluctance to require ever-more detail in warnings. See *Meyers v. Furrow Building Materials*, 659 N.E.2d 1147 (Ind. App.1996); *Welch v. Scripto–Tokai Corp.*, 651 N.E.2d 810 (Ind.App.1995). For good reasons, laid out in *Todd v. Societe BIC, S.A.*, 9 F.3d 1216, 1218–19 (7th Cir.1993) (en banc) (Illinois law): "Extended warnings present several difficulties, first among them that, the more text must be squeezed onto the product, the smaller the type, and the less likely is the consumer to read or remember any of it. Only pithy and bold warnings can be effective. Long passages in capital letters are next to illegible, and long passages in lower case letters are treated as boilerplate. Plaintiff wants a warning in such detail that a magnifying glass would be necessary to read it. Many consumers cannot follow simple instructions (including pictures) describing how to program their video cassette recorders." Indiana has the same general understanding. See *Marshall v. Clark Equipment Corp.*, 680 N.E.2d 1102, 1105 (Ind.App.1997). To be useful, warnings about burns could not stop with abstract information about the relation among a liquid's temperature and volume (which jointly determine not only the number of calories available to impart to the skin but also the maximum rate of delivery), contact time (which determines how many of the available calories are actually delivered), and the severity of burns. It would have to address the risk of burns in real life, starting with the number of cups of coffee sold annually, the number of these that spill (broken down by location, such as home, restaurant, and car), and the probability that any given spill will produce a severe (as opposed to a mild or average) burn. Only after understanding these things could the consumer determine whether the superior taste of hot coffee justifies the incremental risk. Tradeoffs are complex. Few consumers could understand the numbers and reach an intelligent decision on the spot at a checkout counter. Yet such a detailed warning (equivalent to the package insert that comes with drugs) might obscure the principal point that precautions should be taken to avoid spills. Indiana does not require vendors to give warnings in the detail plaintiffs contemplate. It expects consumers to educate themselves about the hazards of daily life—of matches, knives, and kitchen ranges, of bones in fish, and of hot beverages—by general reading and experi-

ence, knowledge they can acquire *before* they enter a mini mart to buy coffee for a journey.

■ With warnings out of the way, the remaining theory of liability comes into focus. Indiana has codified the principles of product liability at I.C. § 33–1–1.5–3. (A new statute, effective July 1, 1998, appears at I.C. § 34–20–2–1 and associated sections. Our attention is confined to the version in force when Angelina McMahon was injured.) Under § 33–1–1.5–3(a) any person who sells "any product in a defective condition unreasonably dangerous to any user or consumer ... is subject to liability". If the defect in question is a *design* defect (as opposed to a blunder in the manufacture of a well-designed product), then "the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product". In other words, a design-defect claim in Indiana is a negligence claim, subject to the understanding that negligence means failure to take precautions that are less expensive than the net costs of accidents. *Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898, 902 (7th Cir.1994); *Miller v. Todd*, 551 N.E.2d 1139, 1141 (Ind.1990). To prevail the plaintiff must show not only that the design is defective but also that the defective product is "unreasonably dangerous." *Koske v. Townsend Engineering Co.*, 551 N.E.2d 437, 440 (Ind.1990). Indiana's law differs in this respect from Ohio's, which permits recovery if *either* the design is defective *or* the consumer is surprised by the risks. *Welch Sand & Gravel, Inc. v. O&K Trojan, Inc.*, 107 Ohio App.3d 218, 668 N.E.2d 529, 533 (Ohio App.1995). The either-or nature of the liability standard in Ohio led the court in *Nadel* to hold that questions about consumers' understanding of coffee's propensity to burn present a triable issue on the consumer-expectations issue.

In Indiana " '[u]nreasonably dangerous' refers to any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases it with the ordinary knowledge about the product's characteristics common to the community of consumers." I.C.

§ 33–1–1.5–2(7). Plaintiffs concentrate their energies on an argument that, although they knew that coffee could burn, Bunn's coffee exposed them to harm "to an *extent* beyond that contemplated by the ordinary consumer" (emphasis added). What we have said about warnings leads us to doubt this line of argument. Several cases, of which *Moss v. Crosman Corp.*, 136 F.3d 1169, 1173–74 (7th Cir. 1998), and *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 624–26 (7th Cir.1995), are examples, reject claims under Indiana law that consumers' failure to appreciate the gravity of the damage a product could do made it "unreasonably dangerous", when the consumers understood that the product could cause a serious injury. Still, we need not decide today whether a third degree burn is "harm to an extent beyond that contemplated by the ordinary consumer" who knows that hot liquids burn. For even if hot coffee is "unreasonably dangerous", the record does not permit a reasonable juror to conclude that the coffee maker was defectively designed.

■ Start with the contention that Bunn's coffee maker was negligently designed because, in the words of Professor Diller, "at the temperatures at which this coffee was brewed and maintained the structural integrity of the styrofoam cup into which the coffee was poured would be compromised making it more flexible and likely to give way or collapse when its rigid lid is removed." It is far from clear to us that this effect, if a substantial one, should be laid at the door of Bunn rather than of the cup's producer (for cup manufacturers must make their products sturdy enough to hold the liquids apt to be poured into them) or the retailer (which must choose a cup designed to hold the beverage safely). Cf. *Rizzo v. Corning Inc.*, 105 F.3d 338 (7th Cir.1997). But even if there were only one kind of beverage cup in the world, we could not follow the argument down this line. How does Diller know that hot beverages make Styrofoam cups too flexible? How *much* more flexible, under what circumstances? How likely to collapse, and how does the failure rate vary with temperature? What is the reasoning (and the data) behind the statement we have

quoted? The affidavit does not say; we have reproduced 100% of the pertinent exposition. Professor Diller, since 1990 Chairman of the Department of Mechanical Engineering of the University of Texas at Austin, is the author of more than 200 scholarly works, many concerning heat transfer. If there is an explanation behind, or empirical support for, the statement we have quoted, Diller is in a good position to furnish it. But it is not there; he offers only a bare conclusion. We have said before, and reiterate, that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid–State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir.1989). See also, e.g., *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.1996). No engineer would put such an unsupported assertion in a scholarly article; Diller would not accept it in a submission to the Journal of Biomechanical Engineering, which he edits; we doubt that he would accept it from a student in a term paper. Why, then, should courts pay it any heed? *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), holds that federal courts must ensure that the methodology and data behind an opinion are scientific. See also *General Electric Co. v. Joiner*, —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Diller's affidavit is inadmissible under *Daubert*, and without it the plaintiffs have no evidence to support this theory of design defect. Naked opinions cannot stave off summary judgment.

■ At first glance plaintiffs' alternative theory is stronger. Coffee at 180° F is considerably more likely to cause severe burns than is coffee at 135° to 140° F, the maximum at which Diller believes that coffee should be served. Moreover, because it is costly to serve coffee hot (it takes electricity to keep the hotplate on), risks could be reduced for a *negative* outlay. How can it not be negligent to spend money for the purpose of making a product more injurious? But of course people spend money to increase their risks all the time—they pay steep prices for ski vacations; they go to baseball games where flying bats and balls abound; they buy BB guns for their children knowing that the pellets can maim. They do these things because

they perceive benefits from skiing, baseball, and target practice. *Moss*, the BB gun case, holds that Indiana does not condemn products as defective just because they are designed to do things that create serious hazards. See also *Smith v. AMLI Realty Co.*, 614 N.E.2d 618 (Ind.App.1993). To determine whether a coffee maker is defective because it holds the beverage at 179°, we must understand the benefits of hot coffee in relation to its costs. As for costs, the record is silent. We do not know whether severe burns from coffee are frequent or rare. On the other side of the ledger there are benefits for all coffee drinkers. Jack McMahon testified that he likes his coffee hot. Why did the American National Standards Institute set 170° F as the *minimum* temperature at which coffee should be held ready to serve? Diller does not make any effort to reconcile his "maximum 140° F" position with the ANSI's "minimum 170° F" position—though this is something that an engineer would be sure to do in scholarly work. On this topic, too, Diller's affidavit is worthless because unreasoned. Without some way to compare the benefits of a design change (fewer and less severe burns) against the costs (less pleasure received from drinking coffee), it is impossible to say that designing a coffee maker to hold coffee at 179° F bespeaks negligent inattention to the risks.

None of this would matter if it were obvious that consumers derive no benefits from coffee served hotter than 140° F; then the principle of *res ipsa loquitur* could do the rest of the work for the McMahons. The ANSI minimum of 170° F prevents us from treating as obvious the absence of benefits from temperatures above 140°. What is more, even a little investigation (albeit unassisted by the parties) shows that there may be good reasons for selecting a temperature over 170° F, as several other courts have recognized. See Michael Sivetz & H. Elliott Foote, 2 *Coffee Processing Technology* ch. 19.2 (1963). The smell (and therefore the taste) of coffee depends heavily on the oils containing aromatic compounds that are dissolved out of the beans during the brewing process. Brewing temperature should be close to 200° F to dissolve them effectively,

but without causing the premature breakdown of these delicate molecules. Coffee smells and tastes best when these aromatic compounds evaporate from the surface of the coffee as it is being drunk. Compounds vital to flavor have boiling points in the range of 150° F to 160° F, and the beverage therefore tastes best when it is this hot and the aromatics vaporize as it is being drunk. For coffee to be 150° F when imbibed, it must be hotter in the pot. Pouring a liquid increases its surface area and cools it; more heat is lost by contact with the cooler container; if the consumer adds cream and sugar (plus a metal spoon to stir them) the liquid's temperature falls again. If the consumer carries the container out for later consumption, the beverage cools still further. Our point in discussing these issues is not to endorse Sivetz & Foote; their position may be scientifically contestable. It is only to demonstrate that without evidence that a holding temperature of 180° F is of little worth to consumers, plaintiffs cannot show that the choice of a high temperature makes coffee defective.

It is easy to sympathize with Angelina McMahon, severely injured by a common household beverage—and, for all we can see, without fault on her part. Using the legal system to shift the costs of this injury to someone else may be attractive to the McMahons, but it would have bad consequences for coffee fanciers who like their beverage hot. First-party health and accident insurance deals with injuries of the kind Angelina suffered without the high costs of adjudication, and without potential side effects such as lukewarm coffee. We do not know whether the McMahons carried such insurance (directly or through an employer's health plan), but we are confident that Indiana law does not make Bunn and similar firms insurers through the tort system of the harms, even grievous ones, that are common to the human existence.

AFFIRMED.