UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

BRENDA K. GARLINGER; JOHNNY A. GARLINGER,

　　　　　*Plaintiffs-Appellants,*

　　　　　v.

HARDEE'S FOOD SYSTEMS, INC.; FAST FOOD MANAGEMENT, INC.,

　　　　　*Defendants-Appellees.*

No. 98-2044

Appeal from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp, Jr., District Judge.
(CA-96-189)

Argued: May 7, 1999

Decided: August 16, 2001

Before WIDENER, MOTZ, and TRAXLER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Gary M. Stern, STERN, STERN & STERN CO., L.P.A., Steubenville, Ohio, for Appellants. Joseph Edward Starkey, Jr., BROWN & LEVICOFF, P.C., Pittsburgh, Pennsylvania, for Appellees. **ON BRIEF:** Avrum Levicoff, BROWN & LEVICOFF, P.C., Pittsburgh, Pennsylvania, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Brenda and Johnny Garlinger seek a new trial on their product liability claim against Hardee's Food Systems, Inc. and a related corporation, Fast Food Management, Inc. (collectively "Hardee's") on the ground that the district court erred in excluding the testimony of their biomedical engineering expert. For the reasons that follow, we affirm.

I.

On December 2, 1994, Brenda and Johnny Garlinger ordered coffee from the drive-through window of a Hardee's fast-food restaurant in Weirton, West Virginia. While a Hardee's employee was passing a cup of coffee to Brenda Garlinger, the cup dropped into Mrs. Garlinger's lap, causing the hot coffee to spill. As a result, Mrs. Garlinger suffered severe second-degree burns on her thigh, which caused permanent scarring.

Based on these events, the Garlingers brought suit against Hardee's in West Virginia state court claiming that the Hardee's employee was negligent in causing the coffee to spill and that Hardee's was strictly liable because its coffee contained a design defect, namely that it was served at an unreasonable and dangerously hot temperature. Hardee's removed the case to federal court on the basis of diversity of citizenship.

To support their strict liability claim, the Garlingers sought to introduce the testimony of Kenneth Diller, a professor of Mechanical and Biomedical Engineering at the University of Texas, and an expert in the field of thermodynamics. The Garlingers proffered Diller's report, created in preparation for trial, which set forth his findings on the length of time it takes liquids at various temperatures to produce threshold second and third-degree burns to human skin. Diller's ulti-

mate conclusion was that Hardee's serving temperature for coffee was unacceptably high for human consumption. Diller stated in his report:

> In my opinion the risk of thermal burn associated with serving coffee at temperatures in the range of 180° to 190°F is unacceptable. Coffee spilled onto bare skin at that temperature will cause a severe burn nearly instantaneously. Further, coffee drunk without dilution at that temperature range will cause burns to the mouth. From the perspective of lowering the probability of causing thermal burns, 150°F is a much safer temperature for serving beverages, and leading burn experts have recommended a temperature of 135°F or lower.

Hardee's moved to exclude Diller's testimony under Fed. R. Evid. 702. The district court, relying on the admissibility standards for expert testimony established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), excluded the testimony, ruling that it "is not so sufficiently tied to the facts of this case as to assist the jury, as the triers of fact, in resolving any factual issue."

At the close of the Garlingers' case-in-chief, Hardee's moved for a directed verdict on the issue of strict liability. The district court granted the motion on the ground that the Garlingers failed to proffer sufficient evidence from which a jury could conclude that Hardee's coffee was a dangerous or defective product under West Virginia law. Following an adverse jury verdict on the negligence claim, the Garlingers filed a motion for a new trial contending that the district court incorrectly excluded Diller's testimony. The district court denied this motion. The Garlingers now appeal, contending that the district court improperly excluded Diller's expert testimony, thereby dooming their strict liability claim. We review a district court's determination of the admissibility of expert testimony under the abuse of discretion standard. *See General Electric Co. v. Joiner*, 522 U.S. 136, 141-42 (1997).

## II.

To prevail in a products liability case under West Virginia law, the plaintiff must prove that the product in question is defective, meaning

that it is not reasonably safe for its intended use. *See Church v. Wesson*, 385 S.E.2d 393, 396 (W. Va. 1989) (citing *Morningstar v. Black & Decker Mfg. Co.*, 253 S.E.2d 666, 667 (W. Va. 1979)). "The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made." *Morningstar*, 253 S.E.2d at 667. *See also Chase v. General Motors Corp.*, 856 F.2d 17, 20 (4th Cir. 1988) ("The question is: did the manufacturer use reasonable care in designing and manufacturing the product at the time it was marketed, not whether it could possibly have been made better or more safe, or later has been made better or more safe.").

In support of their claim that Hardee's coffee was a defective product by virtue of its temperature, the Garlingers sought to introduce the testimony of Diller, an expert in the field of thermodynamics. The admissibility of expert testimony, such as that proffered by the Garlingers here, is governed by Fed. R. Evid. 702, which provides that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . ."

Several years ago, in *Daubert*, the Supreme Court clarified the meaning of Rule 702, explaining that, to be admissible, expert testimony must be both relevant and reliable.* *See Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1383 (4th Cir. 1995) (citing *Daubert*, 509 U.S. at 590). The test for reliability requires the district court to determine whether the expert's testimony is based on scientific knowledge, that is, whether the expert's conclusions are grounded "in the methods and procedures of science" and reflect more than his or her "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

---

*Although *Daubert* concerned only "scientific" expert testimony, the Supreme Court has since held that the rule set forth in that case "applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotation marks omitted).

The relevance inquiry assures that the expert's proposed testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue" as required by Fed. R. Evid. 702. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citations omitted). The consideration of relevance requires the district court to determine whether the testimony "fits" the instant case; not all *reliable* expert testimony is *relevant* expert testimony. *See id.* ("[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."). In other words, Fed. R. Evid 702 requires a valid scientific connection between the expert's testimony and the pertinent inquiry before the court as a precondition to admissibility. *See id.* at 591-93.

With these considerations in mind, we turn to the question of whether the district court abused its discretion in excluding Diller's testimony. We conclude that it did not. Diller's testimony simply does not meet *Daubert*'s requirement of relevance and for that reason, it was properly excluded.

The pertinent inquiry in this case is whether Hardee's coffee, which is served at a temperature of approximately 180 to 190 degrees, is unreasonably dangerous for its intended use, namely human consumption. On this subject, Diller's testimony merely states that "[c]offee spilled onto bare skin at that temperature will cause a severe burn nearly instantaneously" and "coffee drunk without dilution at that temperature range will cause burns to the mouth." Diller further opines that "[f]rom the perspective of lowering the probability of causing thermal burns, 150 degrees is a much safer temperature for serving beverages." In sum, Diller's conclusion is that coffee served at 180 to 190 degrees is hot enough to cause burns and that coffee served at a lower temperature is less likely to do so, an idea that is not disputed by any party.

Although Diller's testimony may well be accurate, it fails to address the key question of whether it was *unreasonable* for Hardee's to serve coffee at that temperature. Importantly, although Diller is an expert on thermodynamics, he possesses no knowledge or experience in the food or beverage industry. Thus, Diller seems unsuited to the task of determining the utility of Hardee's policy of serving coffee at a temperature of 180 to 190 degrees. Perhaps for this reason, Diller

fails even to indicate whether it is *possible* for Hardee's to serve quality coffee at a lower temperature. *See Holowaty v. McDonald's Corp.*, 10 F. Supp. 2d 1078, 1083 (D. Minn. 1998) (to rebut evidence that heat is an essential element of a quality cup of coffee, plaintiffs would need to show it was possible for defendants to sell quality coffee at a lower temperature). Indeed, Diller suggests that, "[f]rom the perspective of lowering the probability of causing thermal burns," coffee served at a temperature of 150 degrees would be safer, but he fails to explain whether such a modification is even possible, and if so, whether Hardee's was unreasonable for failing to make such a modification.

Moreover, Diller's testimony fails to weigh the risks associated with hot coffee against the costs of lowering the serving temperature. Yet this is precisely the inquiry necessary to determine the reasonableness of serving coffee at a given temperature. *See McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998) ("To determine whether a coffee maker is defective because it holds the beverage at 179 degrees, we must understand the benefits of hot coffee in relation to its costs."). Indeed, in *McMahon*, the Seventh Circuit found a very similar affidavit from Diller to be "worthless" because "[w]ithout some way to compare the benefits of a design change (fewer and less severe burns) against the costs (less pleasure received from drinking coffee) it is impossible to say that . . . hold[ing] coffee at 179 degrees F bespeaks negligent attention to the risks." *Id.*

Thus, although Diller's testimony about the effects of hot liquid on human skin may have scientific validity in some contexts, it does not "fit" this case. *See Daubert*, 509 U.S. at 591. As stated in *Daubert*, Fed. R. Evid. 702 requires a valid scientific connection between the expert's testimony and the pertinent inquiry before the court as a precondition to admissibility. *See id.* at 591-93. No such scientific connection exists here. Diller's testimony on the risks associated with serving coffee at a temperature of 180 to 190 degrees, without any information on the feasibility or costs of lowering the serving temperature, does not aid the trier of fact in determining whether it was unreasonably dangerous of Hardee's to serve coffee at the higher temperature. Consequently, the district court did not abuse its discretion in excluding the testimony, and no new trial is warranted.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*