DECISION.
{¶ 1} Plaintiffs-appellants Jackie Vanderpool and her minor children appeal the trial court's entry of summary judgment in favor of defendants-appellees University Hospital, Inc., and the Foundation of Obstetrics and Gynecology, Inc. The issue presented for our review is whether the defendants should have been held vicariously liable for the alleged negligence of Dr. Duma, a state employee, who was the attending physician during Vanderpool's surgery. Holding that Dr. Duma was University Hospital's agent by estoppel and holding that there remain genuine issues of material fact as to whether Dr. Duma was acting within the scope of his employment with the Foundation when supervising Vanderpool's surgery, we reverse the judgment of the trial court.
{¶ 2} Jackie Vanderpool had been a patient at the Obstetrics and Gynecology outpatient clinic ("the clinic") operated by University Hospital, Inc. ("the hospital"), a private corporation, since early 1996. Resident physicians managed the clinic and treated patients under the supervision of faculty from the OB-GYN department at the University of Cincinnati's College of Medicine ("the university"). The university assigned faculty physicians to supervise the clinic on a rotating basis. Despite the university's supervisory role, the residents at the clinic, as well as the administrative staff, were employees of the hospital. There were no signs posted at the clinic to inform patients that residents staffed the clinic. Although the residents' badges stated "University Hospital, Resident, OB/GYN, Dr. * * *," Vanderpool testified that she had never examined a badge and did not realize that the doctors treating her were residents, supervised by faculty doctors who were unaffiliated with the hospital.
{¶ 3} While a patient at the clinic, Vanderpool saw several different doctors for her chronic pelvic pain. Eventually it was determined that Vanderpool would need laproscopic surgery to remove an ovarian cyst. Dr. Porter, the resident who preoperatively assessed Vanderpool, submitted the surgical plan for approval to Dr. Duma, the faculty doctor assigned to the clinic that day. Dr. Duma approved the plan.
{¶ 4} Dr. Porter informed Vanderpool that either Dr. Duma or Dr. Huppert would be participating in her surgery. The surgical consent form signed by Vanderpool stated that "Dr. Rebar et al." would perform the surgery. Dr. Rebar was the chairperson of the university's OB-GYN department. On the day of surgery, Dr. Johnson, a clinic resident, informed Vanderpool that Dr. Huppert would be leading the surgical team. Dr. Huppert, a faculty doctor, was assigned to supervise surgeries that day.
{¶ 5} Dr. Johnson and another resident, Dr. Arovas, participated in Vanderpool's surgery on May 21, 1999. During surgery, Dr. Huppert had to leave, so Dr. Duma was called in to finish the procedure. While Dr. Duma was supervising the procedure, Vanderpool's ureter was cut and damaged. It was only after the surgery that Vanderpool learned of Dr. Duma's participation. Vanderpool had never met Dr. Duma, and Dr. Duma's only contact with Vanderpool was during the surgery. Dr. Duma testified that he had never treated Vanderpool as a private patient.
{¶ 6} The Foundation of Obstetrics and Gynecology, Inc., ("FOG") was the practice corporation for the faculty members of the university's OB-GYN department. The purpose of FOG was to provide support services "to the [faculty] physicians so that they c[ould] continue the practice of medicine." Because the university did not bill patients seen by its faculty members, FOG was responsible for the billing of clinic and private patients treated by the faculty physicians. FOG billed Vanderpool $2200 for Dr. Duma's services during her surgery, although FOG did not collect on the account.
{¶ 7} The university required that all faculty physicians be employees of FOG, as well as of the university. FOG paid 85% of Dr. Duma's salary in 1999 and provided Dr. Duma with liability insurance. A portion of the salary paid by FOG compensated Duma for instructing residents and medical students, duties that were associated with Dr. Duma's employment as a faculty member at the university. Dr. Duma testified that his other duties as an employee of the university included supervising in the clinic, the operating room and the labor and delivery ward, and treating clinic and private patients.
{¶ 8} On June 12, 2002, Vanderpool and her minor children filed a complaint in the common pleas court against Dr. Duma, Dr. Huppert, Dr. Johnson, Dr. Arovas, the hospital and FOG, alleging medical malpractice and loss of consortium. Vanderpool also filed a complaint against the university, a state agency, in the Court of Claims, alleging that it was vicariously liable for the negligence of its employees, Drs. Duma and Huppert. The Court of Claims held that Drs. Duma and Huppert, as state employees, were immune from civil liability pursuant to R.C. 9.86. Accordingly, Vanderpool dismissed Drs. Duma and Huppert from her common pleas suit. She also voluntarily dismissed Drs. Johnson and Arovas from the action in the common pleas court pursuant to Civ.R. 41(A). The suit against the university remains pending in the Court of Claims.
{¶ 9} The only remaining defendants in the common pleas suit, the hospital and FOG, moved for summary judgment. Vanderpool responded by moving for partial summary judgment against the hospital. The court denied Vanderpool's motion and entered summary judgment in favor of the hospital and FOG. In this appeal, Vanderpool now raises two assignments of error, asserting that the trial court erred in granting summary judgment to the hospital and FOG.
{¶ 10} Initially we note that an appellate court reviews a grant of summary judgment de novo.[1] Pursuant to Civ.R. 56(C), summary judgment is to be granted only when no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion, and, with the evidence viewed most strongly in favor of the nonmoving party, that conclusion is adverse to that party.[2]
{¶ 11} In her first assignment, Vanderpool asserts that the trial court erred in granting summary judgment in favor of the hospital and in denying her motion for partial summary judgment.
{¶ 12} In support of its summary-judgment motion, the hospital argued below (1) that Dr. Duma was not its agent by estoppel because Vanderpool looked solely to Dr. Duma for her care; but (2) even if it was determined that Dr. Duma was its agent, the hospital could not be held vicariously liable for his acts because he had been found to be immune from civil liability. Vanderpool maintained in support of her summary-judgment motion that the hospital was vicariously liable for the alleged negligence of Dr. Duma under the doctrine of agency by estoppel, because she had relied upon the clinic, operated by the hospital, to provide her with competent medical services. We find Vanderpool's argument to be persuasive.
 In Clark v. Southview Hospital Family Health Center,[3] the Ohio Supreme Court held,
 A hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital when: (1) it holds itself out to the public as a provider of medical services; and (2) in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care.[4]
 In this case, there is no dispute that the hospital, through its OB-GYN clinic, held itself out to the public as a provider of medical services and that Dr. Duma was an independent contractor and not an employee of the hospital. Instead both parties' arguments center on whether Vanderpool looked to Dr. Duma or to the hospital to provide her with care. The Clark
court, in discussing the second element of the agency-by-estoppel test, noted that the "`the critical question is whether the plaintiff, at the time of her admission to the hospital, was looking to the hospital for treatment of her physical ailments or merely viewed the hospital as the situs where her physician would treat her for her problems.'"[5] "Unless the patient merely viewed the hospital as the situs where her physician would treat her, she had the right to assume and expect that the treatment was being rendered through hospital employees and that any negligence associated therewith would render the hospital liable."[6]
{¶ 13} Based on the evidence submitted with the summary-judgment motions, and regardless of whether that evidence is construed in favor of either moving party, we conclude that reasonable minds could come to but one conclusion: that Vanderpool was looking to the hospital, and not to Dr. Duma as her individual practitioner, to provide her with competent medical care.
{¶ 14} First, the undisputed facts indicate that Vanderpool had no notice or knowledge of the independent relationship between Dr. Duma and the hospital. Dr. Johnson testified in her deposition that there were no signs posted at the clinic to advise patients that they were being treated by residents, who were hospital employees, under the supervision of doctors from the university's OB-GYN department. She also testified that she had not informed Vanderpool that Drs. Huppert and Duma were faculty professors and not employed by the hospital. Vanderpool testified by deposition that she was unaware that the doctors who were treating her were residents working under the supervision of faculty professors. She also testified that a resident informed her that the clinic had a surgical team that operated on clinic patients.
{¶ 15} The hospital argues that Vanderpool had "notice" that her care would be provided by a specific practitioner, and not the hospital, when she was informed two weeks before her surgery that either Dr. Duma or Dr. Huppert would be leading her surgical team. But the hospital misunderstands the meaning of notice in this context. Under Clark, "notice" means informing the patient that there is an independent relationship between the hospital and the doctor treating the patient, so that the patient understands that a specific doctor is responsible for her treatment and not the hospital.[7] Notice is not achieved underClark by merely informing the patient of the name of the doctor who will be treating the patient, as the hospital attempts to argue in this case. Thus, as we have already noted, the undisputed facts reveal that Vanderpool was never informed that Dr. Duma had an independent relationship with the hospital's OB-GYN clinic.
{¶ 16} With the absence of notice established, we now turn to whether Vanderpool looked solely to Dr. Duma or to the hospital for her care. In determining whether a patient is looking to a hospital or an independent practitioner for her care, "a relevant factor * * * [is] whether the hospital provided the plaintiff with [a treating physician] or whether the plaintiff and the treating physician had a patient-physician relationship independent of the hospital setting."[8]
Here, Vanderpool did not have an independent physician-patient relationship with Dr. Duma. She had been attending the clinic for four years and had never been treated by Dr. Duma before her surgery, either in the clinic or in his private practice. Dr. Duma testified that he had never met Vanderpool prior to the day of her surgery and that he had not participated in her follow-up care. Dr. Duma was not listed as the surgeon on Vanderpool's surgical consent from. Instead, the undisputed facts demonstrate that the hospital provided Vanderpool with her doctor.
{¶ 17} During the four years that Vanderpool had been going to the clinic for treatment, she did not see only one doctor, but several different ones. The resident doctors, all hospital employees, were the ones who planned, scheduled and participated in Vanderpool's surgery and aftercare. It was a resident who informed Vanderpool that either Dr. Huppert or Dr. Duma would be leading her surgical team. Vanderpool was not given a choice as to which doctor would lead her surgical team and what doctors would participate in her surgery; that was left to the discretion of the clinic.
{¶ 18} Under these circumstances, we hold that reasonable minds could only come to the conclusion that Vanderpool was looking to the hospital's clinic to provide her with competent medical services, and not to Dr. Duma. Accordingly, Dr. Duma was the hospital's agent under an agency-by-estoppel theory.
{¶ 19} It is well settled that under the doctrine of respondeat superior a principal is vicariously liable for acts of its agent committed within the scope of the agency.[9] But the hospital asserts that even if it should be determined that Dr. Duma was its agent, it was not liable for his acts because a principal may not be held vicariously liable, under respondeat superior, based solely upon the acts of an agent who is immune from liability. In support of this proposition of law, the hospital cites Ford v. Mirto[10] and Cody v. Portage Cty. BarAssn.[11]
{¶ 20} In Cody, the Fifth Appellate District held that a county bar association could not be held vicariously liable for the acts of its agent, its grievance subcommittee, because the subcommittee, pursuant to R.C. 1702, was immune from civil liability.[12] The Cody court, relying on general agency principles, reasoned that since a principal's vicarious liability is derivative of the agent's liability, where an agent is immune from liability, the primary liability is extinguished and, thus, there can be no derivative liability.[13] In Ford, the Eleventh Appellate District held, without discussion, that a volunteer organization could not be held vicariously liable for one of its volunteer's actions when the volunteer was immune from personal liability pursuant to statute.[14] We are convinced that both of these cases are contrary to the established law in Ohio.
{¶ 21} In Adams v. Peoples,[15] the Ohio Supreme Court held that "[i]n the absence of a statute providing immunity," a municipal corporation can be held vicariously liable, under a theory of respondent superior, for the tortious conduct of its employee when that employee is immune from civil liability. In its decision, the court adopted the rule set forth in the Restatement of the Law 2d, Agency (1958) 468-469, Section 217, which provides,
 In an action against a principal based on the conduct of a servant in the course of employment:
* * *
The principal has no defense because of the fact that:
* * *
 (ii) the agent had an immunity from civil liability as to the act.
 Here, there was no statute providing immunity to the hospital, a private corporation, for the negligent or willful acts of its agents. Accordingly, under Adams, the hospital could be held vicariously liable for the tortious acts of its agent, Dr. Duma, even though he was himself immune from civil liability. Based on our decision that the hospital could not use Duma's immunity as a defense to its potential liability, and that Duma, under an agency-by-estoppel theory, was the hospital's agent, we sustain the first assignment of error.
{¶ 22} In her second assignment of error, Vanderpool asserts that the trial court erred in entering summary judgment in favor of FOG. We agree.
{¶ 23} FOG moved for summary judgment on the basis that, although Dr. Duma was its employee, he was not acting within the scope of that employment when supervising Vanderpool's surgery. Instead, FOG maintained that Dr. Duma was acting within his scope of employment as a faculty member of the university. FOG submitted the Court of Claims decision and the sworn testimony from the immunity hearing to support its summary-judgment motion. Vanderpool responded by arguing that, because FOG billed Vanderpool for Dr. Duma's services, Duma was acting within his scope of employment with FOG when participating in Vanderpool's surgery. Vanderpool did not submit any evidence, but she did rely on the testimony from the immunity hearing.
{¶ 24} The testimony of Thomas Frerick, the business administrator of FOG, revealed the following facts. FOG was a not-for-profit corporation created to benefit the university's OB-GYN department. Dr. Duma was a member of FOG. The university required all faculty members in the OB-GYN department to belong to FOG. FOG maintained private medical offices, support staff and medical equipment for the faculty members so that they could continue in their practice of medicine. The university directed FOG to bill for faculty member's services, regardless of whether the doctor treated the patient in the clinic or at his private medical office. FOG retained the money it collected and used it to cover operating expenses, including paying the faculty members' malpractice insurance premiums, health benefits and salaries. FOG made yearly contributions to the university's OB-GYN department.
{¶ 25} Dr. Duma's duties as a faculty member with the university included teaching and supervising residents in the clinic, in the labor and delivery room, and in the operating room. Interestingly, FOG paid 85% of Dr. Duma's salary, which resulted in FOG compensating Dr. Duma for some of his university-related employment duties. There was no testimony presented as to what Dr. Duma's duties were in association with his employment with FOG, although an inference could have been made that because FOG maintained private offices for the faculty members, then Dr. Duma's duty under FOG's employment was to treat private patients. But an inference could also have been drawn that Dr. Duma's FOG duties also included treating clinic patients based on the fact that FOG had billed Vanderpool for Dr. Duma's services during her laparoscopy and would have "gladly accepted her money" if she had paid the bill.
{¶ 26} The Ohio Supreme Court has stated that "where the ultimate fact is undisputed, ordinarily a question of law is presented for determination by the court, but where the ultimate fact must be determined from inferences to be drawn from other facts and where reasonable minds may reach different conclusions from such inferences, then it is proper to submit the determination of the ultimate fact to the jury."[16] Here, the ultimate fact to be decided was whether Dr. Duma was acting within the scope of his employment with FOG at the time he participated in Vanderpool's surgery.[17] We note that this ultimate fact was contingent upon inferences that could be drawn from the undisputed facts in the record. Construing the evidence most strongly in favor of Vanderpool, we hold that reasonable minds could reach different conclusions based on conflicting inferences as to whether Dr. Duma was acting within the scope of FOG's employment. Accordingly, a genuine issue of material fact remained to be decided, and, thus, the entry of summary judgment for FOG was inappropriate. The second assignment of error is well taken.
{¶ 27} Based on the foregoing, we reverse the judgment of the trial court and remand this cause for further proceedings consistent with the law and this decision. On remand, consistent with our resolution of the first assignment of error, we direct the trial court to enter partial summary judgment in favor of Vanderpool on the issue of the hospital's liability for any actionable negligence proved against Dr. Duma.
Judgment reversed and cause remanded.
Doan, J., concurs.
Painter, P.J., concurs separately.
[1] Drusco v. Bank One of Columbus (1997), 124 Ohio App.3d 125,130-131, 705 N.E.2d 717.
[2] State ex rel. Howard v. Ferreri, 70 Ohio St.3d 587, 1994-Ohio-130,639 N.E.2d 1189.
[3] 68 Ohio St.3d 435, 1994-Ohio-519, 628 N.E.2d 46
[4] Id. at 444-445, 628 N.E.2d 46.
[5] Id. at 439, quoting Grewe v. Mt. Clemens Gen. Hosp. (1978),404 Mich. 240, 251, 273 N.E.2d 429.
[6] Id. at 445, 628 N.E.2d 46.
[7] Clark, 68 Ohio St.3d at 445-446, 628 N.E.2d 46.
[8] Id. at 439, 628 N.E.2d 46.
[9] Nadel v. Burger King Corp. (1997), 119 Ohio App.3d 578,695 N.E.2d 1185.
[10] (May 10, 1993), 5th Dist. No. CA-9222.
[11] (Aug. 22, 1997), 11th Dist. No. 96-P-0264.
[12] Cody, supra.
[13] Id.
[14] Ford, supra.
[15] (1985), 18 Ohio St.3d 140, 480 N.E.2d 428.
[16] Bennett v. Sinclair Refining Co. (1944), 144 Ohio St. 139,57 N.E.2d 776; see, also, Bostic v. Connor (1988), 37 Ohio St.3d 144,524 N.E.2d 881, citing O'Day v. Webb (1972), 29 Ohio St.2d 215,280 N.E.2d 896, paragraph four of syllabus ("It is the duty of a trial court to submit an essential issue to the jury when there is sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue * * *").
[17] Mancino v. Capital Natl. Bank (May 7, 1981), 10th Dist. No. 43061 (a dispute over the scope of an agency is properly a subject for the trier of fact).